No. 97,848

STATE OF KANSAS, *Appellant*, v. KARIN J. MORTON, *Appellee*.

(186 P.3d 785)

Opinion filed July 3, 2008.

*Heather R. Jones*, county attorney, argued the cause, and *Paul J. Morrison*, attorney general, was with her on the brief for the appellant.

*Pantaleon Florez, Jr.*, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: The district court suppressed statements Karin J. Morton made in an interview with a criminal investigator for the Government Services Administration (GSA), for failure to provide *Miranda* warnings and because of unfair conduct that rendered her statements involuntary. The State filed an interlocutory appeal. In an unpublished decision filed July 20, 2007, the Court of Appeals reversed the district court, holding that *Miranda* warnings were not required because the interview was not custodial. We granted Morton's petition for review. Although the Court of Appeals correctly determined that *Miranda* warnings were not required because the interview was not custodial, we hold that the agent's conduct rendered Morton's statements involuntary and thus inadmissible. Accordingly, we reverse the Court of Appeals, and affirm the judgment of the district court.

## FACTS

### Factual background

Morton worked for the Ottawa Recreation Commission (ORC), a taxpayer-funded entity that provides recreation services for the community of Ottawa. As part of her job duties, Morton was authorized to purchase federal surplus government property for the ORC. Federal surplus property is not available to the general public and is subject to use restrictions, including that personal use of the property is prohibited for a set period of time.

In early 2004, Morton purchased several travel trailers through the federal program. Paul Schwartz, director of the federal surplus property program, spoke with Morton when she purchased the trailers and advised her of the restrictions. Morton told Schwartz the ORC intended to use the trailers to store equipment and for concessions. Schwartz, being an impassioned guardian entrusted with safeguarding the transfer and subsequent utilization of government-owned surplus property, began investigating ORC's use of the trailers after receiving a letter alleging that some of the

surplus property was not being used in compliance with the program restrictions. Schwartz' intuition led him straight to Morton's residence, where he spotted one of the trailers.

Presumably noting that Morton's residence appeared to be a curious location for a publicly operated concessions stand and/or storage facility, Schwartz sent a compliance check form to the ORC, requesting information regarding the location and current use of the surplus property. Morton completed and signed the form, attesting that all of the trailers were located at the Ottawa ballfields and were being used for concessions stands and quarters for staff and officials.

His duty served, Schwartz then handed the matter over to the GSA and local law enforcement. Officer Weingartner of the Ottawa Police Department began investigating the matter. Officer Weingartner found one of the travel trailers at Morton's residence. Later, he interviewed Morton. Morton was represented by an attorney at the interview. The officer provided *Miranda* warnings and the interview was recorded.

After the Ottawa Police Department completed its report of the investigation, the GSA began its own investigation. The matter was assigned to Special Agent John Pontius, a criminal investigator with the GSA. Agent Pontius reviewed the police report and determined that additional facts were needed about the compliance form. Agent Pontius decided to do a follow-up interview to ask questions about the form.

Agent Pontius got in touch with Morton, and she agreed to meet him at the Ottawa Police Department. Agent Pontius did not provide Morton with *Miranda* warnings prior to questioning her. During the interview, Morton admitted receiving the compliance form, admitted that she filled out the form, and identified her handwriting and her signature on the form.

Agent Pontius sent a summary of his interview to the county attorney's office and to his headquarters. Subsequently, Morton was charged with one count of making a false information under K.S.A. 21-3711, a severity level 8 nonperson felony.

*The suppression hearing*

Prior to trial, Morton filed a motion to suppress her statements to Agent Pontius, contending that the failure to provide her with

*Miranda* warnings required suppression. The State filed a response, contending that Morton was not in custody and, therefore, no *Miranda* warnings were required. The State also argued that Morton's statements were voluntarily made and, therefore, were admissible.

The trial court held a hearing on the suppression motion. Both Agent Pontius and Morton testified. Their respective versions of events differ somewhat.

### Morton's testimony

Morton testified that several months after the Ottawa Police Department investigation was completed, her attorney left a message that a representative from the GSA had contacted his office and said a GSA agent wanted to talk to her about the trailer. She tried to call her attorney back, but he never returned her calls. After several weeks she used the GSA website to obtain Agent Pontius' phone number and left a message for him at his office.

Agent Pontius returned her call. He told her it was an informal interview and asked her if there was some alternative to the local police department where they could meet. She could not think of anyplace private enough, so they agreed on the police department. Morton testified she asked Agent Pontius if this was something she would need her attorney for. Agent Pontius told her, "No, no, it's not that kind of interview. Some people bring their attorneys but it's nothing you'll need an attorney for."

According to Morton, at the time she agreed to meet with the agent she believed the criminal investigation was over. She had read in the paper that the county attorney had declined to prosecute, and her attorney had told her it was over. Morton testified she anticipated there would be a meeting with the GSA because the GSA was the surplus property oversight agency, and it would be deciding whether it would recover the trailer.

Agent Pontius and another special agent met her at the police station at the agreed upon time. He introduced himself and the other agent as "special agents." Morton testified that in her mind, a "special agent" was someone who works for the government and was not synonymous with "criminal investigator." They went into

a break room. Before the interview started, Agent Pontius told Morton she was not under arrest; she did not have to answer their questions; and she could leave at any time. She was not handcuffed or physically restrained in any way.

Toward the end of the interview, Agent Pontius asked her, "Are you aware that this has been returned to the county attorney's office?" She replied that she was not. He asked her, "No one from the county attorney's office has called you?" She said, "No." He then said, "Well, it's back. It's back at her office." Morton testified that Agent Pontius told her that was part of the reason for the interview—to clarify some items on behalf of the county attorney because he was going to forward his report to the county attorney. After the interview, Agent Pontius told her he would have his report on the county attorney's desk in about 2 to 3 weeks.

Morton testified that she was not aware the interview was part of a criminal investigation until the end of the interview. Morton testified that she would have had counsel present at the interview if she had known the county attorney was considering criminal charges again. She said her attorney had advised her that if someone wanted to talk to her as part of the criminal investigation, she should agree, but arrange to have him present.

*Agent Pontius' testimony*

Agent Pontius testified that he wanted to interview Morton to clarify facts about the federal documents that the local police did not ask during their interview. He considered Morton a suspect, and he was conducting a criminal investigation.

Before he contacted Morton to set up an interview, the agent called the attorney who had represented her during her previous interview with the police. According to the agent, the attorney's office said they were not sure they were going to be representing her, so he called Morton at home and left a message. When she called him back, they discussed the interview.

The agent testified that Morton voluntarily met him at the Ottawa Police Department Building. Another agent from his office was present. Before asking any questions, the agent told Morton that she was not under arrest; she was not being detained; the

interview was not mandatory; she could stop talking to them at any time; and she could leave whenever she wanted.

The agent explained that he did not give *Miranda* warnings because they are only required when the individual is in custody. Agent Pontius testified that at no time was Morton handcuffed and the door to the interview room was not locked. She was not deprived of bathroom breaks, food, or water for a significant period of time and was free to leave at any time. After the interview, Morton was not arrested and she was allowed to leave.

Agent Pontius denied telling Morton she did not need an attorney for the interview. Agent Pontius testified he told her he was conducting an investigation, he identified himself as a criminal investigator, and he told her he wanted to ask her some questions concerning the matter she had been interviewed about. He also testified that as a rule, GSA special agents identify themselves with their credentials, which state they are criminal investigators.

*The suppression ruling*

The trial court granted the motion to suppress. The basis for the trial court's decision is difficult to discern, but the ruling appears to have been based on two grounds: the agent's failure to provide *Miranda* warnings and the court's conclusion that the agent's conduct was unfair, rendering Morton's statements involuntary.

The State filed an interlocutory appeal. A panel of the Court of Appeals reversed the district court's decision. *State v. Morton*, No. 97,848, unpublished opinion filed July 20, 2007. The panel held that Morton was not in custody and, therefore, Agent Pontius was not required to provide *Miranda* warnings. Morton filed a petition for review, arguing that the Court of Appeals failed to address the district court's determination that the agent's conduct required suppression. We granted review.

## Discussion

Our standard of review is well-established. We review a decision suppressing evidence under a mixed standard of review. We determine, without reweighing the evidence, whether the facts underlying the trial court's decision are supported by substantial com-

petent evidence. We then conduct a de novo review of the district court's legal conclusion drawn from those facts. *State v. Jones*, 283 Kan. 186, 192, 151 P.3d 22(2007).

1. Does the failure to provide *Miranda* warnings require that Morton's statements be suppressed?

As this court recently explained in *State v. Jones*, 283 Kan. at 192, the *Miranda* rule was designed to safeguard the Fifth Amendment privilege against self-incrimination by reducing the risk of a coerced confession:

"The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. '[T]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause' (*Chavez v. Martinez*, 538 U.S. 760, 790, 155 L. Ed. 2d 984, 123 S. Ct. 1994 [2003] [Kennedy, J., concurring in part and dissenting in part]), the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), concluded that states may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination."

*Miranda* warnings are not required whenever police question someone. " '*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." ' " *Jones*, 283 Kan. at 192-93 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 97 S. Ct. 711 [1977]). This limitation arises out of the basis for the rule itself—concern for the compelling pressures inherent in a custodial interrogation:

"To dissipate 'the overbearing compulsion . . . caused by the isolation of a suspect in police custody,' [citation omitted] the *Miranda* Court required the exclusion of incriminating statements obtained through custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it. [Citation omitted.] We have consistently held, however, that this extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.' " *Minnesota v. Murphy*, 465 U.S. 420, 430, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984).

See also *Oregon v. Mathiason*, 429 U.S. at 495 (stating that it is the coercive environment of the custodial interrogation "to which

*Miranda* by its terms was made applicable, and to which it is limited").

A two-part inquiry is used to determine whether an interrogation is custodial for purposes of *Miranda*. The first prong is: What were the circumstances surrounding the interrogation? We review that determination under a substantial competent evidence standard. The second prong of the inquiry is: Under the totality of those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave? We apply a de novo standard of review to that determination. *State v. Jones*, 283 Kan. at 194.

Thus, our first task is to determine whether the district court's findings of fact concerning the circumstances surrounding the interrogation are supported by substantial competent evidence. The following factors are to be considered in analyzing the circumstances surrounding the interrogation:

" '(1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation—whether the defendant left freely, was detained, or was arrested.' " *Jones*, 283 Kan. at 195 (quoting *State v. Deal*, 271 Kan. 483, 495, 23 P.3d 840 [2001], *abrogated on other grounds by State v. Anthony*, 282 Kan. 201, 214, 145 P.3d 1 [2006]).

These factors are not to be applied mechanically or treated as if each factor bears equal weight. As we said in *Jones*, each case needs to be analyzed on its own facts; some factors will present in one case and not in another, and the importance of each factor may vary from case to case. *Jones*, 283 Kan. at 195.

Morton contends the following factors support a finding of custody: (1) what the agent and the defendant said and did; (2) whether the defendant was being questioned as a witness or suspect; and (3) what happened after the interview.

*What the agent and the defendant said and did*

Morton contends that while she believed the interview was administrative in nature, the agent's actual purpose was to provide

additional information for the county attorney. According to Morton, Agent Pontius' statements that the interview was informal and not the kind of interview she would need any attorney for were deceptive, leading her to believe that the interview was not a criminal investigation when it was.

It appears the district court found it significant that the purpose of the interview was to obtain and provide the county attorney with additional information to aid in pursuing criminal charges, while Morton believed the criminal investigation was over. Substantial competent evidence supports the conclusion that the purpose of the interview was criminal in nature and that Morton was unaware of that fact until the conclusion of the interview.

The district court did not make any specific finding of fact on the disputed matter of whether the agent told Morton she did not need a lawyer because it was not that kind of interview. The district court did, however, conclude that the agent's conduct was unfair, thus requiring suppression. When we apply the mixed standard of review, we do not reweigh testimony or pass on the credibility of witnesses. Instead, we accept as true the evidence and all inferences to be drawn therefrom that support the findings of the trial court and disregard any conflicting evidence or other inferences that might be drawn therefrom. *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). Thus, we accept Morton's version of events as true.

*Whether the defendant was being questioned as a suspect or witness*

As Morton notes, there is no dispute Agent Pontius considered her to be a suspect, not a witness. The district court's decision appears to be based, in part, on the fact that Morton was the focus of the investigation. Accordingly, substantial competent evidence supports the finding that Morton was being questioned as a suspect.

*What happened after the interview*

On this factor, Morton points out the evidence established that Agent Pontius told her he would be sending a copy of his report of the interview to the county attorney. Subsequently, the criminal

case was filed and she surrendered herself to law enforcement in lieu of a formal arrest. The district court did not make any findings concerning what happened after the interview. It is obvious, however, that this criminal case was initiated not long after the agent's interview. Accordingly, substantial competent evidence supports this factor.

In summary, we find the following circumstances surrounding the interrogation are supported by substantial competent evidence. Morton believed the criminal investigation had concluded with no criminal charges to be filed. When she was contacted by Agent Pontius, she believed his involvement was administrative in nature. The agent was conducting a criminal investigation, and Morton was a suspect. The agent told Morton the interview was informal, and when she asked whether she would need a lawyer for the interview, the agent told her no, it was not that kind of interview. Morton agreed to meet Agent Pontius at the police department. She drove herself to the interview, which was held at the police department. The interview took place in a break room, not in a regular interview room. There were two agents present. *Miranda* warnings were not given. Before questioning began, Morton was told she was not under arrest; she could refuse to answer questions; and she could terminate the interview and leave at any time. The room was not locked; Morton was not handcuffed; and she was not physically restrained in any way. After the interview, the agent told Morton the matter was back at the county attorney's office, and that he would be providing a copy of his report to the county attorney. Morton was allowed to leave the interview. Later, Morton was prosecuted.

Having determined the circumstances surrounding the interrogation, our next task is to determine whether, under the totality of those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interview and leave. *Jones*, 283 Kan. at 194. We use an objective standard in determining whether an interrogation is custodial:

"The question of whether an interrogation is custodial must be determined based on an objective standard of how a reasonable person in the suspect's situation would perceive his or her circumstances. Courts must examine all of the

circumstances surrounding the interrogation and determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." 283 Kan. 186, Syl. ¶ 3.

Our task is made difficult by the fact that neither Morton nor the State argue this prong of the inquiry. Morton argues only that had she been given *Miranda*, and had she been told that the interview was a criminal investigation for the purpose of providing additional information to the county attorney, she would have had an attorney present. Under these circumstances, Morton argues, the failure to give *Miranda* warnings was fundamentally unfair.

The problem with Morton's argument is that her beliefs about the nature of the interview and the subjective intentions of the agent are only relevant to the custody inquiry *if* they would have caused a reasonable person to believe he or she was not free to terminate the interview and leave. As we noted in *Jones*, custody " 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' " *Jones*, 283 Kan. at 193 (quoting *Stansbury v. California*, 511 U.S. 318, 323, 128 L. Ed. 2d 293, 114 S. Ct. 1526 [1994]).

Under this standard, an officer's intent, purpose, and views concerning the nature of the interrogation and whether the individual is a suspect are relevant to the determination of custody only if they were communicated to or otherwise made known to the individual being questioned and if they would have affected how a reasonable person would have perceived his or her freedom to leave:

"It is well settled then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*. [Citation omitted.] The same principle obtains if an officer's undisclosed assessment is that the person being questioned is not a suspect. In either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts. Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of the interrogation or interview, and thus cannot affect the *Miranda* custody inquiry. 'The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating

officer's suspicions.' [citation omitted.]" *Stansbury v. California*, 511 U.S. at 324-25.

See also *Jones*, 283 Kan. at 193 (discussing the objective standard under *Berkemer v. McCarty*, 468 U.S. 420, 82 L. Ed. 2d 317, 104 S. Ct. 3138 [1984]; *Stansbury*); *State v. Fritschen*, 247 Kan. 592, 597-603, 802 P.2d 558 (1990) (discussing the development of the objective standard and holding that the fact a suspect is the focus of the investigation is relevant under the objective standard only if the suspect was aware he or she was the focus and a reasonable person in the suspect's position would have felt that because of this he or she was in custody); *State v. James*, 276 Kan. 737, 752, 79 P.3d 169 (2003) (existence of an out-of-state felony warrant that required the defendant be detained, which was known to the officers but not the defendant, did not convert interview into a custodial interrogation because the custody test is based on an objective standard).

Under this objective standard, Agent Pontius' focus on Morton as a suspect, his purpose in conducting the interview, and his intent to reinstigate charges are relevant to the determination of custody for purposes of *Miranda* only if they were communicated to or otherwise made known to Morton and would have affected how a reasonable person would have perceived his or her freedom to terminate the interview and leave. The evidence establishes that Morton was unaware of any of that until the end of the interview. Accordingly, Agent Pontius' subjective knowledge, purpose, plan, and intent are not relevant to the objective custody inquiry.

Similarly, Morton's subjective beliefs concerning the nature of the interview have no bearing on the custody inquiry. The determination of custody for purposes of *Miranda* is determined by the objective circumstances, not by the subjective view harbored by the person being questioned. *Jones*, 283 Kan. at 193. In *Yarborough v. Alvarado*, 541 U.S. 652, 158 L. Ed. 2d 938, 124 S. Ct. 2140 (2004), the Supreme Court held that a suspect's prior experience with law enforcement is not a relevant factor in the custody inquiry. The Court distinguished the objective *Miranda* custody inquiry from other types of inquiries, like the voluntariness of a confession,

that are based on the mindset and characteristics of the particular suspect. *Alvarado*, 541 U.S. at 667-68. An objective test "furthers 'the clarity of [the *Miranda*] rule, [citation omitted] ensuring that the police do not need 'to make guesses as to [the circumstances] at issue before deciding how they may interrogate the suspect. [Citation omitted.]' " *Alvarado*, 541 U.S. at 667. Allowing the suspect's individual characteristics to be a part of the custody analysis, even if styled as an objective test—what would a reasonable person of the suspect's age, experience level, etc. have believed—would ruin this clarity, as it would require police officers to consider a suspect's mindset when faced with deciding whether they are required to give *Miranda* warnings. *Alvarado*, 541 U.S. at 667-69.

Morton also argues the agent's statement that she did not need a lawyer because it was not that kind of interview was a lie and was intended to deceive her about the criminal nature of the interview. This, she argues, violated her rights under *Miranda*. Accordingly, we must determine whether lies or deceptions are relevant to the custody inquiry.

A police officer's comment about the need for a lawyer was at issue in *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 (1995), *abrogated on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 (2003). Although the interview was noncustodial, the officer read *Miranda* rights before questioning Haddock. At the point where the officer advised Haddock of his right to have a lawyer present, Haddock asked, "Is there any reason for me to?" 257 Kan. at 975. The officer responded, "Not at this point, I don't." 257 Kan. at 975.

Haddock argued the officer's statement was misleading, deceptive, and tainted the waiver of his *Miranda* rights. 257 Kan. at 975. The district court denied suppression, ruling that Haddock was not in custody during the interview. On appeal, Haddock argued that the officer's response to his question about the need to have a lawyer present violated his *Miranda* rights. He argued that the noncustodial nature of the interrogation was irrelevant because *Miranda* warnings were given. This, he argued, triggered *Miranda*'s protections and, thus, the officer was required to " 'honor the defendant's constitutional rights[,]' " even in a noncustodial

setting. 257 Kan. at 976. The court disagreed, holding that *Miranda*'s protections simply do not exist outside of the context of a custodial interrogation:

"Custody would not matter if Haddock was contending that his statements were obtained through coercion, threats, or duress, or other involuntary means violating due process. See *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987) (noting that even if *Miranda* rights are not violated, statements may be inadmissible if made involuntarily). However, the 'constitutional rights' Haddock seeks to enforce—the safeguards against self-incrimination established by *Miranda*—do not exist outside 'custodial interrogation.' See, *e.g., United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994); *State v. Fritschen*, 247 Kan. 592, 597, 802 P.2d 558 (1990) ('*Miranda* only applies if the interrogation was custodial.'). Although we have never addressed the question directly, other courts have held that the giving of *Miranda* warnings, itself, does not transform a noncustodial interrogation into a custodial interrogation. *United States v. Charles*, 738 F.2d 686, 693 n.6 (5th Cir. 1984); *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir.), *cert. denied* 434 U.S. 863." 257 Kan. at 976-77.

Although our holding in *Haddock* was that giving *Miranda* warnings in a noncustodial setting does not make the interview custodial, it is at least implicit in the decision that the officer's comment about the need for a lawyer is not relevant to the determination of custody for purposes of *Miranda. Cf. Oregon v. Mathiason*, 429 U.S. at 495-96 (falsely telling a suspect that his fingerprints were found at the scene not relevant to whether the respondent was in custody for purposes of *Miranda*). Accordingly, in considering whether a reasonable person in Morton's situation would have felt free to terminate the interview and leave, the agent's undisclosed purpose and intent, Morton's subjective beliefs about the nature of the interview, and the agent's comment about the need for a lawyer are not relevant.

Setting those circumstances aside, the totality of the remaining relevant circumstances supports the conclusion that a reasonable person would have felt free to leave the interrogation. Morton agreed to meet with Agent Pontius, and voluntarily drove herself to the police station to be interviewed. The interview took place in a break room; the room was not locked; and she was not handcuffed or restrained in any way. Agent Pontius told her she was not in custody; she could refuse to answer questions; and she was free to

leave at any time. Morton was allowed to leave at the end of the interview.

Although this issue is decided on a case-by-case basis, case law supports the conclusion that under these circumstances, a reasonable person would not have believed himself or herself to be in custody. See *State v. Jones*, 283 Kan. at 196-200 (interview noncustodial where, although defendant was under subpoena and was arrested after the interview, he came to the interview voluntarily, officers told him he was not in custody and that the interview was voluntary, he was not restrained or threatened, and he was initially questioned as a witness); *State v. James*, 276 Kan. 737 (interview noncustodial where defendant went to police station voluntarily, defendant was initially questioned as a witness, officer told defendant he was not under arrest, defendant was not restrained, defendant had access to cell phone and pager, and defendant was arrested at end of interview on outstanding Missouri warrant); *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (first interview at police station was noncustodial, defendant was free to go, interview took place in interview room, officers drove defendant to police station, defendant left freely after the interview, interview lasted over 2 hours, and the defendant was not a suspect); *State v. Heath*, 264 Kan. 557, 591, 957 P.2d 449 (1998) (as cited in *Jones*, 283 Kan. at 199) (interview was not custodial where defendant went to the police station voluntarily to be interviewed and waited unrestrained in waiting room prior to interview); *State v. Fritschen*, 247 Kan at 604-05 (interview noncustodial where defendant voluntarily went to police station to be interviewed, he was informed he was not under arrest and was free to leave, only two officers were present, officers did not yell at or threaten defendant, defendant was not handcuffed or restrained, officers started to take defendant home at one point, and the officers told defendant he could consult a lawyer and they would honor such a request).

Morton relies on *State v. Deal* in support of suppression. In *Deal*, the police wanted to speak to the defendant as part of their investigation into the disappearance and death of Aubry Phalp. Officers located Deal and asked him to come to the police station to speak with them about Phalp's disappearance. They did not inform him

that Phalp had been found dead just the day before. Deal agreed and drove to the police department while the police followed. Deal was interviewed without *Miranda* warnings.

The trial court denied Deal's motion to suppress. On appeal, Deal argued the following circumstances surrounding the interrogation demonstrated that he was in custody: (1) the interrogation took place in the early evening and at the police station; (2) it lasted about 3 hours; (3) there were two detectives present during most of the interview; (4) the detectives never told him he was free to leave; (5) the detectives told him they were investigating Phalp as a missing person and did not reveal that it was actually a homicide investigation, as Phalp had been found dead; (6) although he was not in handcuffs, Deal was in a locked interview room; (7) the detectives continually asked him about his whereabouts the weekend of Phalp's death and asked him to take a lie detector test after finally admitting they were investigating Phalp's murder; (8) he was escorted to the police station although he went voluntarily; and (9) he was allowed to leave freely after the interview ended. *Deal*, 271 Kan. at 498.

The State argued that the following circumstances showed that Deal was not in custody: (1) Deal willingly went to the police station; (2) although Deal was never told he was free to leave, the officers would have allowed him to leave at any time if he had wanted to; (3) Deal was not handcuffed or placed under arrest; and (4) Deal never asked to make any phone calls or asked for anyone else to be present. 271 Kan. at 498-99.

We affirmed the trial court's ruling that Deal was not in custody, holding that under those circumstances, a reasonable person would not have understood the situation to be a custodial interrogation. 271 Kan. at 499.

*Deal* does not support suppression in this case. The circumstances here are even less likely to have caused a reasonable person to have believed he or she was in custody than in *Deal*. In *Deal*, the defendant was escorted to the police department, while here, Morton drove unescorted to the police station. Deal was never told he was free to leave, while here, Morton was specifically told that she was not under arrest, she could refuse to answer questions,

and she could leave at any time. And in *Deal*, the interview room was locked, while here the interview took place in an unlocked break room.

In summary, the Court of Appeals correctly concluded that because Morton was not in custody, the agent was not required to administer *Miranda* warnings. Thus, the Court of Appeals was correct in holding that the district court erred in ordering Morton's statements suppressed for failure to give *Miranda* warnings. However, that is not the end of the analysis. The Court of Appeals failed to address the other component of the trial court's ruling—whether the conduct of the agent in this case rendered Morton's statements inadmissible under the voluntariness standard.

2. Did the agent's conduct render Morton's statements involuntary and, thus, inadmissible?

Unwarned inculpatory statements obtained through noncustodial interrogation, although not barred by *Miranda*, may nevertheless be inadmissible if they were obtained in violation of the due process voluntariness requirement. See *State v. Haddock*, 257 Kan. at 976 (citing *United States v. Chalan*, 812 F.2d 1302, 1307 [10th Cir. 1987]). As the United States Supreme Court has stated:

"We recognize of course that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .' [Citation omitted.] When such a claim is raised, it is the duty of an appellate court, including this Court, 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' [Citation omitted.]" *Beckwith v. United States*, 425 U.S. 341, 347-48, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976).

Thus, there is a two-tiered standard for admissibility of a defendant's statements to law enforcement officers:

"[A]lthough the *Miranda* standard is the first line of inquiry in every case, the voluntariness standard is the ultimate criterion for the admissibility of a confession. Violation of *Miranda* terminates the inquiry, the confession being per se inadmissible. Conformity with *Miranda*, however, merely triggers the second line of analysis—the voluntariness standard.

. . . .

"The two-tiered analysis of confessions . . . is required because the Supreme Court has held that *Miranda* does not coincide with the constitutional standard of voluntariness, but is only a prophylactic procedure to aid in the determining the admissibility of confessions." 3 Ringel, Searches & Seizures, Arrests and Confessions § 24:5 (2d ed. 1993).

The agent's undisclosed purpose for the interview, Morton's subjective beliefs about the civil nature of the interview, and the agent's comment about the need for an attorney are not relevant to the issue of whether Morton was "in custody" for purposes of *Miranda*. These circumstances may nevertheless be relevant to a claim that her statements were inadmissible under the due process voluntariness standard. In this case, it appears the district court determined that the agent's conduct was fundamentally unfair and, thus, Morton's statements were not voluntary.

In determining whether a defendant's confession is voluntary, "the essential inquiry . . . is whether the statement was the product of the free and independent will of the accused." *State v. Walker*, 283 Kan. 587, 596, 153 P.3d 1257 (2007). In making this determination, the court considers the following specific factors:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Walker*, 283 Kan. at 596-97.

In this case, there is no claim that Morton had a mental condition that impacted the voluntariness of her statements. Morton has not claimed the manner or duration of the interview made her statements involuntary. Specifically, there is no evidence the agent was hostile, threatening, or abusive. Further, Morton has not claimed the length of the interview was so long that her will was overborne. She has not claimed she was deprived of the ability to communicate with the outside world during the interview. And there is no claim that her age, level of education, or background are relevant to the admissibility of her statements. In fact, the evidence showed Morton was 40 years old and has a degree in public administration. Instead, only the fifth factor—the fairness of the officers—is at issue in this case.

The district court cited *State v. Price* in support of its decision concerning the fairness of the agent's conduct. In *Price*, the defendant was an inmate at the Norton Correctional Facility, serving a sentence on another case when he was questioned by a KBI agent. Before the interview, the agent provided the defendant with *Miranda* warnings, but he recited them from memory, rather than reading from the standard form. The warning failed to include the advice that an attorney would be provided if the defendant wanted one, and that he could stop answering questions at any time.

A *Jackson v. Denno* hearing was held to determine the voluntariness of the defendant's statements, and at the conclusion of the hearing the district court ordered the confession suppressed. See 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). The State appealed on a question reserved. This court, however, refused to entertain the State's appeal because it did not involve a question that would provide helpful precedent to the bench, bar, and law enforcement personnel. *Price*, 247 Kan. at 103-04. This court also noted that the record failed to contain all of the facts the trial court may have taken into consideration in its ruling. *Price*, 247 Kan. at 103.

*Price* does not support a determination that the agent's conduct in this case requires suppression. The fairness of the officers was not at issue in the *Price* appeal. It appears the only reason *Price* was mentioned by the district court is that it lists the factors to be considered in assessing voluntariness, which list includes the fairness of the officers.

### The fairness of the officer in conducting the interrogation

In this case, the district court found the agent's conduct to be unfair because, while Morton believed the criminal investigation had ended with no charges to be filed, the purpose of the agent's interview was to further the criminal investigation and encourage the filing of charges by providing additional information to the county attorney. Additionally, Morton argues that the agent's comment that she did not need an attorney because it was not that kind of interview was fundamentally unfair. Consequently, the is-

sue concerns the extent to which the officer's conduct was unfair and, thus, rendered Morton's statements involuntary.

We have held that false statements to a suspect about the strength of the evidence do not, by themselves, render the suspect's confession involuntary. *State v. Wakefield*, 267 Kan. 116, 128, 977 P.2d 941 (1999). Rather, they must be viewed in conjunction with the totality of the circumstances surrounding the confession to determine whether it was voluntarily made. *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 3, 106 P.3d 39 (2005); see also *State v. Ackward*, 281 Kan. 2, 9-10, 16, 128 P.3d 382 (2006) (under totality of the circumstances, officers' false statements that included the representation that they had a surveillance camera recording of the defendant, his hands were being swabbed for a gunshot residue analysis that would show whether he had fired or even held a gun in the past 48 hours, there were multiple eyewitnesses, and another person was cooperating with police, did not render confession involuntary).

While telling a suspect false information about the evidence against the suspect, standing alone, does not render a confession involuntary, giving the suspect false or misleading information about the law is more problematic:

"As opposed to giving the suspect false information regarding the status of the investigation against him, misleading the suspect regarding points of law is generally held to invalidate subsequent confessions. Suppression of confessions induced by the latter technique is presumably made on the basis that the use of such deception is fundamentally unfair, since the technique is no more likely to induce untrue confessions than the use of any other falsehoods by the police." 3 Ringel, Searches & Seizures, Arrests and Confessions § 25:8.

See also 2 La Fave, Criminal Procedure 3d, § 6.2(c) (2007) (while misrepresentations about the strength of the government's case by itself is insufficient to render a confession involuntary, "courts are much less likely to tolerate misrepresentations of the law").

In *State v. Ackward*, this court considered the extent to which misrepresentations of the law factored into the determination of the voluntariness of a confession. In that case, the defendant shot the unarmed victim in the back during a drug transaction. We found that the detective misrepresented the law during his inter-

rogation of the defendant when he suggested the killing might have been a reckless homicide, as such a possibility was unlikely under the facts of the case. *Ackward,* 281 Kan. at 14. We also found the detective misled the defendant about the law when he suggested that the killing could be excused as self-defense. *Ackward,* 281 Kan. at 15. We held, however, that suppression was not required as the misrepresentations were not egregious and, although the detective also used false statements of fact, phony forensic analysis, and religious references during the interrogation, under the totality of the circumstances, the defendant's confession "was the product of his free and independent will." *Ackward,* 281 Kan. at 15-16.

In the present case, the agent's conduct did not involve false statements about the evidence against Morton or misrepresentations of the law. Telling Morton she did not need a lawyer because it was not that kind of interview did not misrepresent the law as Morton had no *right* to have an attorney present in a noncustodial interview. See *Minnesota v. Murphy,* 465 U.S. 420, 424, n.3, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984) (stating that where the defendant is not "in custody" for purposes of *Miranda,* there is no Fifth Amendment right to have an attorney present at the interview).

Agent Pontius, however, did not tell Morton she had no *right* to have an attorney present, he told her she did not *need* an attorney. In asking the agent whether she needed a lawyer present, Morton was clearly trying to determine whether the interview was part of the criminal investigation. Of course, the agent knew it was. We note that, as a government agent for an agency with both civil and criminal investigative power, the criminal investigatory purpose of the agent's interview was not obvious in the way an interview conducted by police officers and detectives is. Under these circumstances, we conclude the agent's response to Morton's question was an affirmative misrepresentation about the true nature of the interview.

The question then is whether the agent's conduct rendered Morton's statements involuntary. In answering this question, the court considers the conduct in light of the totality of the circumstances. *State v. Swanigan,* 279 Kan. at 32. The essential inquiry is whether

the statements were the product of Morton's free and independent will. See *Walker*, 283 Kan. at 596.

All other aspects of the circumstances surrounding this interview indicate that Morton's statements were voluntarily made. She was a 40-year-old, college-educated woman who had been involved in a criminal investigation in this very matter. There was nothing coercive about the manner and duration of the interview, and there is no evidence she was deprived of contact with the outside world during the interview. In fact, she was explicitly told she did not have to answer any questions, she could stop the interview at any time, and she was free to leave at any time. However, Morton had an attorney who had represented her during this criminal investigation concerning the trailers and it was her intent and desire to have the benefit of the advice and presence of counsel in this criminal investigation. Had she known Agent Pontius was conducting a criminal investigation, she would not have agreed to the interview without the advice and presence of counsel. We consider this in conjunction with the facts that Morton believed the criminal investigation had ended and the agent's status as a criminal investigator was not patently apparent. Under these circumstances, by reason of the agent's conduct, Morton's participation in the interview and the statements given therein were not the product of her free and independent will. Accordingly, Morton's statements were involuntary and, thus, inadmissible.

The decision of the Court of Appeals is reversed, and the district court's decision is affirmed.

MCFARLAND, C.J., dissenting: I respectfully dissent from the majority's conclusion that Agent Pontius' conduct rendered Morton's statement involuntary and inadmissible.

I do not disagree that, under the unique facts of this case, the agent's response to Morton's question about whether she would need an attorney for the interview was an affirmative misrepresentation about the criminal nature of the interview. I further agree that the agent's response that the interview was nothing she would need a lawyer for, is to be considered as part of the totality of the circumstances in determining whether Morton's statement was the

product of her free and independent will. *State v. Walker*, 283 Kan. 587, 596, 153 P.3d 1257 (2007). What I disagree with is with the majority's conclusion that, under the totality of the circumstances in this case, the agent's comment rendered Morton's statements involuntary.

As the majority states, "[a]ll other aspects of the circumstances surrounding this interview indicate that Morton's statements were voluntarily made." Specifically, Morton was a 40-year-old, college-educated woman who had been involved in a criminal investigation in this very matter. After her calls to her attorney about the agent's desire to interview her went unanswered, Morton took it upon herself to contact the agent directly. She voluntarily agreed to meet the agent at the police station. There was no undue pressure to participate in the interview. She drove herself to the interview. The interview was held in a break room, not in an interrogation room. It is undisputed that at the start of the interview Morton was told the interview was voluntary, she could refuse to answer questions, and she was free to leave at any time. During the interview, the door to the break room was not locked, nor was Morton handcuffed or restrained in any way. The interview lasted only a little over 2 hours. There is no evidence that during the interview she was denied breaks or contact with the outside world. At the conclusion of the interview she was allowed to leave. Under these circumstances, there was simply nothing that would support a finding that Morton's statement was involuntary.

Notwithstanding all of that, the majority concludes that the agent's comment, standing alone among this overwhelming abundance of circumstances demonstrating that Morton's statement was the product of her free and independent will, was sufficient to render her statement involuntary. Although we have not addressed a situation like this one, it is well settled that deceptive interrogation tactics do not, standing alone, establish coercion. See *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005) (citing *State v. Wakefield*, 267 Kan. 116, 127-28, 977 P.2d 941 [1999], for the proposition that deceptive interrogation techniques alone do not establish coercion); see also *State v. Swanigan*, 279 Kan. 18, 32, 37, 106 P.3d 39 (2005) (deceptive police tactics standing alone do

not render a confession involuntary; instead, such tactics are to be considered as a factor in the totality of the circumstances); *State v. Wakefield,* 267 Kan. at 127-28 (officers' conduct in misrepresenting their motivations and lying to the defendant about the evidence against him does not make a confession involuntary as long as the statements are the product of the defendant's free and independent will).

The majority does not cite, nor is there any case in which we have found deceptive interrogation tactics, standing alone, were sufficient to render an otherwise voluntary confession involuntary. Indeed, we have found confessions voluntary where deceptive police conduct has been part of a totality of circumstances much more coercive than those present in this case. As noted in the majority opinion, in *State v. Ackward,* 281 Kan. 2, 128 P.3d 382 (2006), we held that the defendant's confession was not involuntary under a totality of circumstances which included the officers' misrepresentations of the law concerning the applicability of self-defense and reckless homicide, false statements that there was a surveillance camera recording, there were multiple eyewitnesses, another person was cooperating with police, and forensic analysis of swabs from the defendant's hands would show whether he had fired or even held a gun in the past 48 hours, as well as appeals to the defendant's religious beliefs.

For this reason, I dissent.

DAVIS, J., joins in the foregoing dissenting opinion.

DAVIS, J., dissenting: I join with Chief Justice McFarland in her dissent from the majority's conclusion that Agent Pontius' conduct rendered Morton's statement involuntary and inadmissible. I write separately to emphasize that an application of the criteria to determine voluntariness, as set forth in the majority opinion, does not lead to the conclusion that " 'the behavior of . . . law enforcement officials was such as to overbear [Morton's] will to resist and bring about confessions not freely self-determined.' [Citation omitted.]" *Beckwith v. United States,* 425 U.S. 341, 347-48, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976).

The majority opinion accurately states that a determination as to whether a defendant's confession is voluntary—and thus satisfies the requirements of due process—turns on whether the confession is "the product of the free and independent will of the accused. [Citation omitted.]" *State v. Walker,* 283 Kan. 587, 596, 153 P.3d 1257 (2007). The court considers the totality of the circumstances surrounding the statement, including the following factors, as noted by the majority:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *Walker,* 283 Kan. at 596-97; see *Morton,* Kan. at 650.

In my opinion, application of these factors to the circumstances in this case—particularly in light of the previous case law of this court and of the United States Supreme Court—does not support the majority's conclusion that Morton's admissions were involuntarily given.

In this case, we deal with a 40-year-old, college-educated woman working in what appears to be a professional capacity with the Ottawa Recreation Commission (ORC). There is no evidence to suggest that her mental condition was anything other than that of a rational human being. In fact, the majority opinion recognizes that "there is no claim that Morton had a mental condition that impacted the voluntariness of her statements." 286 Kan. at 650. Likewise, there is nothing in the record to suggest that at the time she talked with Agent Pontius, she was subjected to undue influence. As the majority states, there is "no evidence the agent was hostile, threatening, or abusive." 286 Kan. at 650. In short, there is nothing in the record to indicate that Morton's actions and subsequent statements were involuntary in light of the first factor listed in *Walker.*

The manner and duration of the interrogation further suggests voluntariness. First and foremost, the majority concludes that the session was not custodial, as Morton called the agent in response to his phone call to her, agreed on the place to meet for the interview, and drove herself to the session. 286 Kan. at 646-47. Morton

contacted her attorney but could not reach him before attending the interview and nevertheless decided to meet with Agent Pontius. During the interview, she was told that she did not have to answer any questions and was free to leave anytime she desired, and she was not arrested but left of her own accord. The interview itself lasted for only a brief duration. Thus, the second factor does not support a conclusion other than that her conduct and discussion with Agent Pontius was voluntary.

The third factor—Morton's ability to communicate with the outside world—supports the same conclusion that Morton's statements were voluntarily given. Although the defendant was able to contact her attorney, she elected to go to the interview when the attorney could not be reached. She was free to leave anytime and was not required to answer any questions. She was free to come and go as she pleased. Morton has never claimed that she was deprived of the ability to communicate with the outside world. 286 Kan. at 650.

The fourth factor also demonstrates voluntariness. The majority opinion acknowledges that Morton does not claim that "her age, level of education, or background are relevant to the admissibility of her statements." 286 Kan. at 650. This statement is somewhat misleading because these factors are surely *relevant* to a determination of voluntariness, as our discussion in *Walker* indicates. An examination of these factors demonstrates, however, that her statements were knowingly and voluntarily made. Morton's age and occupation suggest a level of competence in dealing with world problems; her intellect, capable of obtaining a college degree, suggests an above-average intellectual capacity. This is a woman who had been interviewed by the police with her attorney present concerning the same matter—a woman who tried to contact her attorney for the interview in question but could not reach him so consciously decided to go it alone. Her background with this matter was extensive, as well as her background with the legal requirements surrounding surplus property and the demands of her position with the ORC.

In examining these four factors, the majority opinion came to the same conclusion that I do here—that all of these "other aspects of the circumstances surrounding this interview indicate that Mor-

ton's statements were voluntarily made." 286 Kan. at 654. Despite this recognition, however, the majority concludes that Morton's statements during the interview with Agent Pontius were rendered involuntary *solely* on the basis of the agent's previous statement that the interview was not the sort where she would need an attorney. To put this conclusion into the context of our due process jurisprudence relating to confessions, the majority has determined that the agent's conduct in advising Morton that she did not need an attorney (thus implying that this was not part of a criminal investigation) had the effect of overbearing her will so as to *compel* her to make involuntary statements.

I do not dispute that Agent Pontius' misrepresentation to Morton regarding the nature of the interview was wholly inappropriate or that it must be made crystal clear that his conduct is unacceptable for a professional criminal investigator. I would conclude—as the majority does in this case—that if Morton had known that the criminal investigation was ongoing, she probably would not have gone to the interview. But this conclusion wholly fails to support the conclusion that the interview was anything but voluntary on her part. Instead, as the Chief Justice notes in her dissenting opinion, we have tolerated this sort of material misrepresentation in criminal investigations on numerous occasions, and we have *never* concluded that a misrepresentation of law, standing alone, renders a statement involuntary. I would conclude that although the agent's misrepresentation is certainly a *factor* to be considered in the court's assessment of voluntariness, that factor alone does not indicate that under the totality of the circumstances, Morton's statements were not the product of a free and independent will.

To reach its conclusion that Agent Pontius' misrepresentation rendered Morton's subsequent statements involuntary, the majority determines that the agent's conduct had the effect of " 'misleading the suspect regarding points of law,' " and such legal deception " 'is generally held to invalidate subsequent confessions.' " 286 Kan. at 652 (quoting 3 Ringel, Searches & Seizures, Arrests and Confessions § 25:8 [2d ed. 1993]). Interestingly, the majority recognizes that " 'giving the suspect false information regarding the status of the investigation against him [or her]' " does not have the

same result of rendering a statement involuntary. See 286 Kan. at 652 (quoting 3 Ringel, Searches & Seizures, Arrests and Confessions § 25:8).

I would conclude that Agent Pontius did not misrepresent the law to Morton. In fact, I question whether we are confronted in this case with a point of law. Even the majority opinion acknowledges that "[t]elling Morton she did not need a lawyer because it was not that kind of interview *did not misrepresent the law* as Morton had no *right* to have an attorney present in a noncustodial interview." (Emphasis added.) 286 Kan. at 653. Instead, the majority concludes that "the agent's response to Morton's question was an affirmative misrepresentation about *the true nature of the interview*." (Emphasis added.) 286 Kan. at 653. It strikes me that Agent Pontius' statement had the effect of " 'giving the suspect false information regarding the status of the investigation against him [or her].' " 286 Kan. at 652. While the agent's statement took the form of legal advice—you do not need an attorney—this is not the type of misrepresentation of the law that might give rise to a voluntariness question. See *State v. Haddock*, 257 Kan. 964, 975, 897 P.2d 152 (1995), *abrogated on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 (2003).

Giving due consideration to the totality of circumstances surrounding the interview with particular emphasis on the factors we have considered important in determining whether a particular confession is voluntary, I would conclude that Morton's statement was voluntary. I realize that the resolution of this issue is not a numbers determination based on the factors to be considered, but given the strength of all other factors and the weakness of the one relied on by the majority, I would conclude that Morton's statement was not obtained in violation of her due process rights.

McFARLAND, C.J., joins in the foregoing dissenting opinion.