No. 101,902

STATE OF KANSAS, *Appellee*, v. JAMAAL SUMMERS, *Appellant*.
(272 P.3d 1)

Opinion filed February 3, 2012.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Jamaal Summers was charged with first-degree murder. His first jury trial resulted in a mistrial because the jury could not reach a unanimous verdict. At a second trial, the jury convicted Summers of first-degree murder. The trial court imposed a life sentence without the possibility of parole for 25 years, and lifetime postrelease supervision.

Summers challenges his conviction on three grounds. We hold that (1) the trial court did not err in admitting statements Summers made to police during an interview at his father's house, (2) the trial court did not err in allowing the victim's wife and neighbor to testify that the victim told them his friend, "Homie," was coming over that evening, and (3) the trial court did not err in handling the prosecutor's inappropriate question during cross-examination of a defense witness. We affirm his conviction.

Summers also challenges the trial court's imposition of lifetime postrelease supervision as part of his sentence. We hold that the trial court does not have the authority to order a term of postrelease supervision in conjunction with an off-grid, indeterminate life sentence. Therefore, the portion of Summers' sentence imposing lifetime postrelease supervision is vacated.

FACTUAL BACKGROUND

On New Year's Eve leading into 2007, Teresa Putman heard gunshots from her neighbor's backyard. She told her husband about the gunshots, but ultimately concluded that the gunshots were part of a New Year's Eve tradition for her neighbors, Leslie and Jamaal Summers. During the summer of 2007, Teresa's 12-year-old son, Thomas Ross, found a bullet casing in the yard while he was mowing. Teresa threw the shell casing toward the woods behind their home and told her son to leave it alone. Ross retrieved the casing for his collection, which he kept in a glasses case in his bedroom.

At 8:22 on the morning of June 18, 2007, Summers called the police to report that his .40 caliber semiautomatic handgun had been stolen. Eight minutes later, at 8:30 a.m., Summers made the first of numerous calls to the victim, Salvador Velasquez. A total of 12 calls, ranging in length from 1 to 2 minutes, were made on June 18 between Salvador's cell phone and phones associated with Summers. Summers' phone numbers were listed in Salvador's cell phone as "Homi" and "Homi2." Summers explained that these calls were made to arrange for him to purchase marijuana from Salvador.

Adriana Lopez, Salvador's wife, worked until 3 p.m. on June 18, 2007. She ran several errands before arriving home around 4 p.m. Salvador was outside the house with their dog, Scooby. Scooby was a stray Labrador-Rottweiler mix that tended to get overly excited around people, so the couple always shut Scooby in their bedroom when company came to their house.

After Adriana and Salvador had eaten some nachos she had brought home from work, Adriana went inside to cook dinner. When Adriana went outside to tell Salvador dinner was ready, she saw he was talking on his cell phone. They went inside to eat together. After dinner, Adriana got dressed to go to the gym. Salvador told Adriana he was expecting company that evening, specifically, that Homie was coming over. Adriana left the house at about 5 p.m.

At around 4:30 p.m., Salvador's neighbor, Sandra Aguirre, got home with her daughter. She saw Salvador outside talking to her

husband and nephew, Luis Valdez. She went inside to cook dinner, but the men stayed outside talking to Salvador for about half an hour. Salvador told Valdez and his uncle that he had to return home because his friend Homie was coming over.

Also around 4:30 p.m., Summers was visiting his wife, Leslie Summers, at her office at the Midwest United Credit Union at Blue Ridge and Longview in South Kansas City. Summers was driving the Jaguar that day, which had a good car seat, while Leslie had taken the minivan with the "kind of ragged" car seat. Leslie printed some paperwork for Summers' music business. Summers testified that he went out to his car, reviewed the paperwork, called Salvador to cancel the marijuana purchase, and switched the car seats between his vehicle and his wife's vehicle, before walking back into the credit union. Summers claimed he went back into the credit union so that Leslie could make copies for him, before driving to his Aunt Alice's apartment.

Summers testified that he drove to his Aunt Alice's apartment, located about 10 minutes from the credit union, because he had been checking on his aunt since her recent discharge from the hospital. Aunt Alice testified somewhat vaguely that she thought she had seen Summers outside with the Summers' minivan that day, but she had been unable to answer the door in time to talk with him. Leslie testified that she drove the minivan to Aunt Alice's after work, where she waved at Summers to get going because they were running late to pick up their son from day care, which was located about 20 minutes from Alice's apartment. Leslie signed their son out of day care at 5:30 p.m. Summers and Leslie testified that they returned home, ate dinner, and stayed home for the remainder of the evening.

Sandra Simental passed by Adriana and Salvador's house as she walked from her house to her mother's house, a distance of about 1 block. She left her house at about 4:45 p.m. She returned to her house at 5:02 p.m., noting the time because she was babysitting a friend's children and the children were to be picked up at 5 p.m. She saw Salvador talking to a black man, whom Salvador invited into his front yard. She identified Summers as the black man she

had seen with Salvador, both in a photographic lineup presented by officers the next day and in court.

Michael Rios testified that he drove past Salvador's house between 5:30 and 5:45 that afternoon, taking a group of kids to Sonic for ice cream after a day spent cutting grass for the city. He saw Salvador sitting on the porch with his dog, talking on his phone. When detectives first talked to Rios, he thought he had gone to Sonic around 6:45 p.m. When the detectives took a second statement, Rios suggested the time might have been 30 to 45 minutes earlier. Rios testified that they spent 30 to 45 minutes at Sonic, returning around 6:15 p.m. Upon his return, he was unable to drive down the block because an ambulance, fire trucks, and police cars at Salvador and Adriana's house had blocked the street.

Adriana checked into Gold's Gym at 5:23 p.m. She left the gym at 6:18 p.m. Driving to Walmart, she called Salvador's cell phone twice but he did not answer his phone. She called her neighbor, Simental, to ask if Salvador's truck was still parked outside the house. Simental confirmed that Salvador's truck was parked in its usual location. Adriana purchased several things at Walmart, paying for her items at 7 p.m.

Adriana returned home to find her front door unlocked, which was unusual because she and Salvador always locked the door. She found her husband lying on the floor between the hallway and the living room. She dropped her purse and Walmart bags and knelt down by Salvador. She found Scooby shut in the bedroom. Otherwise, the house appeared just as it had been when she left.

Adriana ran to Sandra Aguirre's house for help. Valdez went into Adriana's house with her and touched Salvador to see if there was anything he could do. Valdez caught Scooby outside, because he was one of the few people who would touch the dog, and put him into Salvador's truck. Another neighbor called the police, reporting a dead body. The deputy coroner determined the cause of Salvador's death was multiple gunshot wounds to the head, chest, and neck.

Three PMC brand .40 caliber Smith and Wesson cartridge cases were found near Salvador's body. The Kansas Bureau of Investigation forensic laboratory compared those shell casings to the In-

dependence brand .40 caliber Smith and Wesson cartridge case turned in by Ross. The firearm and tool mark examiner concluded that all four cartridge cases had been fired from the same firearm.

After a trial, the jury convicted Summers of first-degree murder. Additional facts will be added as necessary.

## SUMMERS' STATEMENTS

On June 23, 2007, 5 days after Salvador's death but nearly a month before Summers' arrest, two officers met with Summers at his father's house. Summers' wife, his father, his mother, and his grandfather were also present. They sat down at a kitchen or dining room table to talk. The officers came dressed in business casual apparel, displaying their badges on their belts, and carrying their service weapons. The officers said that they were there to talk to Summers about someone who they believed to be Summers' friend, who had been killed in Armourdale. The officers explained to Summers that he was not in custody and that they did not feel the need to *Mirandize* him.

After talking for 30 to 45 minutes, the police recorded a 2- to 3-minute statement from Summers. The officers collected an oral swab of Summers' DNA as well as Summers' fingerprints. Summers told the officers he did not know Salvador, did not recognize his picture, and had never been to his house. The officers told Summers they did not believe he was being truthful. At that point, Summers asked the officers to leave and they left.

Although Summers did not make a confession or directly incriminating statements during the interview, he did make statements that were inconsistent with the evidence. Summers later testified that he lied to the officers because he had called Salvador to buy some marijuana. Knowing that Salvador had been murdered and not knowing what else Salvador was into other than marijuana, Summers was reluctant to admit knowing Salvador in front of his wife and father.

Summers filed a motion to suppress evidence on January 15, 2008. After hearing evidence and arguments at a pretrial hearing, the trial court ruled Summers' statements were admissible. Defense counsel timely objected to the admission of this evidence at

trial. On appeal, Summers argues that the interrogation was custodial because he was being questioned as a suspect, not a witness. Summers claims he felt he was being questioned as a suspect because the officers were investigating a murder, he had spoken to Salvador several times on the day of the murder, and his ties to Salvador were complicated by their illegal drug connection. Summers claims that the statements should have been suppressed because *Miranda* warnings were not given.

*Standard of Review*

When reviewing a district court ruling on a motion to suppress a confession, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Edwards*, 291 Kan. 532, 545, 243 P.3d 683 (2010).

"A two-part inquiry is used to determine whether an interrogation is custodial for purposes of *Miranda*. The first prong is: What were the circumstances surrounding the interrogation? We review that determination under a substantial competent evidence standard. The second prong of the inquiry is: Under the totality of those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave? We apply a de novo standard of review to that determination. [Citation omitted.]" *State v. Morton*, 286 Kan. 632, 640, 186 P.3d 785 (2008).

*Analysis*

We begin by reviewing the circumstances surrounding the interrogation under a substantial competent evidence standard to determine whether *Miranda* warnings were required. Several nonexclusive factors may be considered when reviewing the totality of the circumstances surrounding the statements, including

" ' "(1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and

(8) what happened after the interrogation—whether the defendant left freely, was detained, or was arrested.'" [Citation omitted.]" *Morton*, 286 Kan. at 640.

The trial court found the following circumstances existed at the time of Summers' interrogation. Summers arranged the meeting with the officers at his parents' house. He was interviewed in the presence of his family. The interview lasted less than an hour. His wife testified that the officers were cordial to her and Summers. When the officers became confrontational, Summers asked them to leave and they left the house. The interview was conducted 5 days after Salvador's death, but Summers was not arrested for nearly a month after the interview. Substantial competent evidence supports the existence of the circumstances found by the trial court. Our review of the totality of the circumstances surrounding the statements leads us to agree with the trial court's ruling.

We then use an objective standard to determine whether the interrogation was custodial, *i.e.*, whether, under the totality of the circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interview. *Morton*, 286 Kan. at 642. Considering the totality of the circumstances, we hold that a reasonable person would have felt that he or she was at liberty to terminate the interview. In fact, Summers told the officers to leave, and the officers did leave. " 'It is well settled then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*.' " *Morton*, 286 Kan. at 643 (quoting *Stansbury v. California*, 511 U.S. 318, 324-25, 114 S. Ct. 1526, 128 L. Ed. 2d 293 [1994]). Summers' statements were made before the officers became confrontational about the truth of Summers' claims that he did not know the victim. A reasonable person in these circumstances would have felt that he or she was free to terminate the interview; therefore, *Miranda* warnings were not necessary.

VICTIM'S STATEMENTS THAT HE EXPECTED "HOMIE" TO VISIT

Before the first jury trial, Summers filed a motion in limine to exclude Salvador's statements to his wife, Adriana, that he was expecting his friend, Homie, to visit the evening of his murder. Ad-

riana identified Summers as the friend Salvador referred to as "Homie." Phone records showed that the phone numbers in Salvador's cell phone under "Homi" and "Homi2" belonged to Summers. Before the second jury trial, Summers again raised this issue, extending the motion to cover similar statements made to a neighbor as well as those made to Adriana. Defense counsel made a timely objection when Adriana testified that Salvador was expecting Homie to come over, and also when the neighbor, Valdez, testified that Salvador said he had to go back to his house because Homie was coming over.

*Standard of Review*

This court reviews a trial court's determination that hearsay is admissible under a statutory exception, such as K.S.A. 2006 Supp. 60-460(d)(3) here, for an abuse of discretion. " ' "The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " [Citation omitted.]" *State v. Davis*, 283 Kan. 569, 573, 158 P.3d 317 (2006).

*Analysis*

The State argued, and the trial court agreed, that the following exception to the hearsay rule applied to Salvador's statements:

"A statement which the judge finds was made . . . if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2006 Supp. 60-460(d)(3).

The declarant, Salvador, was obviously unavailable because his death resulted in the charges in this case. Similarly, the challenged statements were made prior to the commencement of this action. Additionally, the trial court heard testimony concerning several phone calls that took place between Summers and Salvador during the time Adriana was at home with Salvador. Summers argued that the autopsy report showed cocaine and marijuana in Salvador's body, which suggests that his recollection and judgment might have been impaired. The trial judge rejected this argument by referencing the first trial, where he ruled:

"THE COURT: Well, certainly it's hard to imagine that his memory wasn't sharp enough to remember it from the end of the conversation until he immediately told the witness. I think it's a stretch to say that there's a question as to his perception to the extent that he wouldn't—wouldn't have understood the conversation that he had just heard and related to the witness here.

"So I do believe it—I agree with both counsel that it is an exception to the hearsay. There's nono indication there's any incentive to falsify or distort or there would have been at the time that he made the statement."

On appeal, Summers complains that the trial court did not make any finding regarding the good faith of Salvador in making these statements to his wife and that the trial court did not make any specific findings regarding the statutory requirements with regard to the statements Salvador made to his neighbor.

Summers testified that his plan was to meet Salvador that day to purchase marijuana. He explained that the nature of their transactions required several phone calls because Salvador had to arrange to get the marijuana from a third party and then arrange to meet him. Summers testified that while he was at the credit union speaking to his wife, he missed a call from Salvador. He returned this call from the parking lot and canceled the arrangement to meet Salvador because it had taken too long for Salvador to get the marijuana and Summers' wife had made plans for their evening.

The statement made by the victim to his wife during or shortly after the phone call fits easily within the K.S.A. 2006 Supp. 60-460(d)(3) hearsay exception. The statement was made shortly after or while Salvador spoke to Summers and made the plans. Adriana testified that she and Salvador had just eaten and that he seemed coherent and normal, which supports the trial court's finding that Salvador's recollection was clear. The trial court found that the statement was made simply to tell his wife the plan for the evening, which suggests the statement was made in good faith and with no incentive to falsify or distort.

The statement Salvador made to his neighbor, Valdez, is a closer question because this statement was further removed in time from the phone call in which Salvador made plans to meet with Summers that evening. However, these two instances are not the only time this information was put before the jury. Defense counsel made

no objection when Officer Sunderman testified that Adriana told him at the scene that Salvador had received a call from Homie, who said he was on his way to their house. Nor did defense counsel object when Detectives Michael Lucas and Michael Vivian testified that Adriana told each of them that Salvador was expecting Homie to visit that evening. The statement Salvador made to Valdez is cumulative evidence that Salvador expected Homie to visit that evening. As such, we need not reach the question of whether the trial court abused its discretion in admitting the statement to Valdez.

The statement Salvador made to his wife was admissible under K.S.A. 2006 Supp. 60-460(d)(3). The trial court did not err in admitting this statement.

### PROSECUTOR'S IMPROPER CROSS-EXAMINATION

Summers was on video at the Midwest United Credit Union, 21 miles from Salvador's house, from 4:24 p.m. to 4:26 p.m. Due to technical problems with the credit union's video surveillance system, this time may be off by as much as 9 minutes. Simental testified that she saw Summers talking to Salvador outside Salvador's house at about 4:45 p.m. Summers sought to prove that the distance between the credit union and Salvador's house discredited Simental's identification.

On another business day around 4:30 p.m., Detectives Vivian and Lucas drove from the credit union to Salvador's house. Detective Vivian testified that the drive took about 20 to 21 minutes. Detective Lucas testified that the drive took 21 minutes. Defense counsel cross-examined both officers regarding the route they took and their method of calculating time.

Brian Underwood, an investigator hired by the defense, drove from the credit union to Salvador's house on Monday, October 27, 2008, leaving the credit union at 4:26 p.m. Underwood testified that the drive took 29 minutes. The prosecutor began cross-examination of Underwood by asking, "Did [the defense attorney] tell you what route his client took back on June 18th of 2007?" Defense counsel objected, saying it was improper to suggest that his client took any route because he was presenting an alibi de-

fense. Although the court sustained the objection, did the question prejudice Summers' right to a fair trial?

## Standard of Review

"[W]e begin by determining whether the prosecutor's questions were proper. Within the scope of a prosecutorial misconduct analysis, this inquiry would answer whether the questions were within the latitude allowed the prosecutor. Then, in an analytical step unique to prosecutorial misconduct analysis, an appellate court, in determining if the prosecutor's conduct requires reversal, reviews (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." *State v. Inkelaar*, 293 Kan. 414, 428, 264 P.3d 81 (2011).

## Analysis

Defense counsel made a timely objection to the prosecutor's question, which the trial court sustained. No further inquiry was made on this subject. In his motion for a new trial, Summers stated that the clear purpose of Underwood's testimony that it took 29 minutes to drive from the credit union where Summers was seen on tape at 4:26 p.m. to the scene of the crime where Simental testified that she saw Summers at 4:45 p.m. was to demonstrate that Summers could not have been where Simental claimed to have seen him. This testimony was presented as part of Summers' alibi defense that he went from the credit union to his aunt's apartment and then to the day care location before going home, which was the same alibi outlined in the alibi notice and presented at the first trial. Summers argued that the clear implication of the prosecutor's question was that Summers and his counsel were lying to the jury and that the State knew that he had gone to Salvador's home and told his attorney the route he took between the credit union and Salvador's house.

Summers argues on appeal that the question assumed Summers had driven to Salvador's house from the credit union. He again argues that the question was improper because it suggested that he and his attorney were being dishonest with the jury. The State claims the question was a poorly worded attempt to determine whether the witness drove the route the State was alleging Sum-

mers had driven to get to Salvador's house—the same route driven by Detectives Vivian and Lucus—or some other route.

"Prosecutorial misconduct . . . may occur when a prosecutor asks a question for which the prosecutor has no reason to believe there is a foundation of fact or law." *Inkelaar*, 293 Kan. at 428. The trial court ruled that the prosecutor had no reason to believe there was a foundation of fact for this question and sustained the objection. The witness had described how he came up with the route after consulting several sources. The trial court noted that this was the same route used by the detectives. There was nothing to suggest that defense counsel had told the witness what route Summers had taken from the credit union to Salvador's house, in large part because Summers maintained that he had not driven from the credit union to Salvador's house.

Although the question was improper, the trial court appropriately sustained defense counsel's objection. The question was not answered, and the subject was not brought up again. The State presented a compelling circumstantial case against Summers. Summers reported his gun stolen the morning before the murder, just before he called Salvador. He made plans to meet with Salvador to purchase marijuana later that day. His gun was used to fire the shots that killed Salvador. He made frequent phone calls to Salvador up to the time of his death, but no calls after Salvador's death despite his claim that he did not know Salvador was dead. The question, while inappropriate, was objected to, and the objection was sustained, which cured any possible prejudice in this strong circumstantial case.

### LIFETIME POSTRELEASE SUPERVISION

Summers was convicted of first-degree premeditated murder, an off-grid offense. See K.S.A. 21-3401. The trial court imposed a life sentence without the possibility of parole for 25 years (hard 25). The trial court also imposed lifetime postrelease supervision. The State concedes that the trial court erred and that Summers should be subject to lifetime parole rather than postrelease supervision.

This court recently considered this issue and concluded that "[a]n inmate who has received an off-grid indeterminate life sentence can leave prison only if the successor to the Kansas Parole Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence." *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011). Because the trial court erred in imposing lifetime postrelease supervision, that portion of Summers's sentence is hereby vacated.

The conviction is affirmed, and the sentence is affirmed in part and vacated in part.