No. 105,613

STATE OF KANSAS, *Appellee*, v. ROBERT D. CLARK, JR., *Appellant*.

(317 P.3d 776)

Opinion filed February 7, 2014.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Robert D. Clark of two counts of aggravated indecent liberties with a child under 14 years of age in

violation of K.S.A. 21-3504(a)(3)(A). In considering Clark's direct appeal, we reject Clark's sole attack on his convictions and hold the evidence was sufficient to support the jury's verdict that he engaged in the lewd fondling or touching of two children with the specific intent to arouse or satisfy his sexual desires, the desires of the children, or both. Although we affirm Clark's convictions, we find merit in two issues relating to Clark's sentences and vacate those portions of his sentences that imposed lifetime postrelease supervision and lifetime electronic monitoring.

## FACTS AND PROCEDURAL BACKGROUND

Clark's convictions arose from his touching of A.L. and C.L., who were his son's daughters.

Clark's relationship with his son was "[s]trained at best" during his son's childhood. The two lost touch in the late 1980's and approximately 15 years passed before they reconnected. During the time they were estranged, Clark's son married and moved to Topeka. Clark contacted his son in the early 2000's, but their contact consisted of only telephone conversations until Clark also moved to Topeka in early 2008. Once Clark moved to Topeka, he would visit his son's residence at least once a week and would have "[j]ust regular family interaction" with his son and his son's family, which included five children.

On June 9, 2009, after Clark left his son's residence, 12-year-old A.L. asked to privately speak with her mother. A.L. told her mother that "Grandpa [Clark] has been touching me." A.L. explained that Clark had been touching her breasts "every opportunity he seemed to have." Later that night, A.L. told her father that "for at least six months, . . . since before Christmas of 2008, that just about every time [Clark] would sit next to her on the couch or wherever they were, he would reach his arm over her shoulder and touch her breasts." A.L. told her father she would occasionally move Clark's hand and tell him to stop. Clark would temporarily stop, but within a few minutes he would begin to rub her breasts again. A.L. decided to tell her parents because she had become "extremely uncomfortable" during a visit to Clark's apartment earlier in the day. She told her parents she had bent over while cleaning Clark's oven

and he had said, "It's okay. No one is looking at your butt except me." The comment made her feel like "he didn't care about [her]," and she decided it was time to tell her parents what was happening.

A.L.'s parents concluded Clark needed help but decided to handle the situation within the family and try to get Clark counseling instead of involving law enforcement. The next day, Clark's son confronted Clark, telling Clark he could not see his grandchildren again until he received counseling. In response, Clark's "shoulders slumped over and he lowered his head," and he apologized for being inappropriate. He said, "When I found myself being inappropriate with them," "I would tell myself to stop because I know this isn't right." He also explained, "I would find my hand there and I would just—sometime I would take it away and say no, this isn't right; I can't do this; this is inappropriate." He also admitted, "I always thought I would get in trouble for something like this."

Because Clark referred to "them," his son suspected that Clark had also touched his 10-year-old daughter C.L., and so, along with his wife, he asked C.L. if she had been touched by her grandfather. C.L. told her parents Clark would rub her breast almost every time they sat on the couch together.

Other family members soon learned of A.L.'s and C.L.'s accusations, leading the girls' grandmother and their aunt to file a report with the Topeka Police Department. The following day, the girls' father also went to the Topeka Police Department to file a report.

A detective spoke separately with A.L. and C.L. at Prairie Advocacy Center. Using anatomically correct dolls, A.L. placed the male doll's hand over the female doll's shoulders and then rubbed and fondled the female doll's breast. C.L. also used the dolls to demonstrate that her grandfather put his arm over her shoulder and rubbed her breast with an open hand.

In the investigation that followed, Clark agreed to speak with a detective. Clark offered that he knew he was being accused of indecent liberties with a child under the age of 14. Clark explained that he had gone to the public library to look at the statute books to research what charges he might face. Clark was adamant, as he continued to be throughout the investigation and prosecution, that

he was not going to say anything against his grandchildren and that he did not want to call his grandchildren liars.

When asked specifically about the events of June 9, 2009, Clark explained that he had been at his son's house early in the day. He then left to run errands, and A.L. and C.L. asked if they could come along. When they finished running the errands, the girls went with Clark to his apartment. A.L. cleaned Clark's oven because she had burnt a few things while learning how to cook. When Clark mentioned this, the detective asked Clark if he had said anything about A.L.'s buttocks or made any comment that would have made her uncomfortable. Clark indicated he "honestly [didn't] remember saying anything like that."

But Clark did confess to inappropriately touching A.L. and C.L. He stated that he "found [himself] sitting on the couch with the girls" and his "arm would go around them" and his hand "[might] be in an inappropriate place" without him realizing what he was doing. He stated, "I tried to stop when I found myself doing it, [and] move[d] my hand because I don't want it to happen." He indicated that his hand would be touching the girls' "upper breast area." He also admitted that his hand would be moving around in a motion that could be described as rubbing the girls' breasts. According to Clark, the touching happened often, probably more than 10 times. He also stated that on one occasion A.L. told him to stop touching her. Clark denied ever touching A.L.'s or C.L.'s buttocks but also indicated any touching of the girls' buttocks was unintentional when he was hugging them goodbye.

Clark claimed the touching of the girls' breasts was unintentional and unconscious, until "all a sudden it's like—you're not supposed to be doing this." He did admit that putting his arm around the girls' shoulders was a conscious movement but claimed "my hands move when I talk." He denied ever touching the girls under their clothes or touching their genital areas. Further, he denied touching them for sexual arousal and indicated he never thought about the touching later, stating: "I don't get sexually aroused by younger females." When asked why he repeatedly touched his granddaughters, his response was, "[p]robably . . . proximity, they are there." He also stated, "[I]t's where they are at and the fact that I have

problems keeping my hands still." At one point, Clark indicated he could not explain why he touched the girls, prompting the detective to ask, "If you can't give me any other explanation other than for sexual reasons, what conclusion am I to draw?" Clark responded, "I don't know."

Clark was charged with two counts of aggravated indecent liberties with a child under 14 years of age in violation of K.S.A. 21-3504(a)(3)(A).

At trial on those charges, A.L. testified Clark frequently rubbed her breast. She told the jury, "[W]e would be normally at my house and we would be sitting on the couch and he'd put his arm around my shoulder and rub my breast." Clark would whisper and ask her if it was okay. "Almost every time I would tell him to stop," but he would either "move his hand away and then put it back a few minutes later" or just leave his hand on her breast. A.L. indicated that the touching began before Christmas 2008 and continued almost every time Clark came over to her house, which was once or twice a week. She also testified he had touched her two or three times at the movie theater and a few times at Clark's apartment. A.L. also stated that on a few occasions, maybe five times, Clark "would give me a hug and put his hand on my butt, rubbing my butt" when he was leaving. In addition, A.L. told the jury she saw Clark touch C.L. once; Clark "put his arm around [C.L.'s] shoulder and rubbed her too."

On cross-examination, A.L. verified that any touching occurred over her clothing and Clark never asked her to touch him. Further, Clark never threatened to physically hurt A.L. or physically forced himself on her, and he never told her not to tell anyone about the touching. A.L. also indicated the touching would often occur when her brother, sister, and mother would be in the same room, although she explained her mother would generally be sitting at the computer and facing the opposite direction.

C.L. also testified at the trial. She told the jury that on approximately 20 occasions when she and Clark were at her house or his apartment he would put his hand over her shoulder and touch her breast over her clothes, often in a rubbing motion. She indicated

Clark never said anything while he was touching her, he never told her not to tell anyone, and he never asked her to touch him.

Other State's evidence included the testimony of the detective who told the jury about her interviews with A.L., C.L., and Clark. The jury also viewed the video recording of the detective's interview with Clark. In addition, the detective testified that Clark started keeping a journal after A.L. came forward with her accusations. In the journal, Clark wrote that he was on borrowed time and would face the consequences he needed to face.

Clark chose not to testify, and the jury convicted Clark of two counts of aggravated indecent liberties with a child under 14 years of age. The sentencing judge imposed two concurrent life sentences with a mandatory minimum of 25 years. See K.S.A. 21-4643. The sentencing judge ordered "lifetime postrelease" and signed a journal entry ordering lifetime electronic monitoring.

Clark timely appeals his convictions and sentences. This court has jurisdiction under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed and off-grid crime).

## SUFFICIENT EVIDENCE

In his only attack on his conviction, Clark asserts there was insufficient evidence to support his aggravated indecent liberties convictions in violation of K.S.A. 21-3504(a)(3)(A). To convict Clark, the State was required to prove beyond a reasonable doubt that (1) Clark lewdly fondled or touched A.L. and C.L.; (2) Clark engaged in this conduct with the intent to arouse or to satisfy the sexual desires of either himself, the children, or both; (3) A.L. and C.L. were under the age of 14 at the time of the acts; and (4) the conduct took place in Shawnee County on or about the dates alleged in the criminal complaint. As at trial, Clark does not dispute that he engaged in lewd fondling or touching of A.L. and C.L., that the children were under the age of 14, and that the conduct took place in Shawnee County on or about the dates alleged. Instead, the only element he disputes is intent, which under the terms of the statute requires proof of a specific intent to arouse or satisfy his sexual desires, the sexual desires of the children, or both. See K.S.A. 21-3504(a)(3)(A) ("with the intent to arouse"); *State v.*

*Brown*, 291 Kan. 646, 654, 244 P.3d 267 (2011) (aggravated indecent liberties is a specific intent crime); *State v. Belcher*, 269 Kan. 2, 7, 4 P.3d 1137 (2000) (same).

Our standard of review is well known: "When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012) (citing *State v. Ward*, 292 Kan. 541, 581, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012], and *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 [2010]). In evaluating the evidence, " '[t]he appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence.' " *State v. Spear*, 297 Kan. 780, 791, 304 P.3d 1246 (2013) (quoting *Raskie*, 293 Kan. at 920); accord *State v. Ta*, 296 Kan. 230, 237, 290 P.3d 652 (2012).

In arguing that the evidence does not meet this sufficiency standard, Clark suggests the only direct evidence of intent was his statement to the detective that he was not sexually interested in the girls and his conduct did not arouse him. His denial and the lack of direct evidence that he was actually aroused do not end our inquiry, however, because "[a]*ctual* arousal or satisfaction of the sexual desires of either participant is not necessary for the existence of the crime." (Emphasis added.) *State v. Brown*, 295 Kan. 181, 201, 284 P.3d 977 (2012). Rather, what is prohibited is a lewd touching with the *intent* to arouse sexual desires.

In addition, Clark attempts to suggest his touching of his granddaughters was accidental or, even if intentional, was not done with a sexual intent. He supports his argument by pointing out the type of evidence the State did not present. For example, he notes that he never touched the girls under their clothes or around their genitalia. Moreover, he did not ask them to touch him in a sexual manner or tell the girls not to tell anyone about the touching. Further, Clark argues that he did not make any sexual references to the girls or speak to them in a sexual manner while he was touching them.

Certainly, the presence of any of these circumstances would have strengthened the State's case against Clark. Nevertheless, the absence of these circumstances does not mean the evidence of intent was insufficient. Indeed, there was significant circumstantial evidence the touching was not accidental but was intentional, repeated, and motivated by the intent to arouse the sexual desires of Clark, his granddaughters, or both; and circumstantial evidence can be sufficient to meet the State's burden of proof beyond a reasonable doubt. See *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010) ("A conviction for even the gravest offense may be sustained by circumstantial evidence.").

Among the circumstances tending to show this intent is the pattern of the touching—Clark touched A.L. and C.L. almost every time Clark visited the children over a several-month period. Second, Clark admitted that he was aware that his actions were inappropriate and that he would even tell himself to stop, but apparently he was unable to control his impulses. Third, the acts themselves were significant; the repeated rubbing of both girls' breast area, as opposed to an area of the body without sexual connotation, by its very nature suggests a sexual intent. Fourth, Clark persisted even over A.L.'s protest. Fifth, his pattern of conduct with both of his granddaughters was consistent. Finally, there was evidence of Clark's consciousness of his guilt. He researched crimes and concluded he could be charged with aggravated indecent liberties, he wrote in his journal that he was on borrowed time, and he told his son he always thought he would get in trouble for "something like this." See *State v. Phillips*, 295 Kan. 929, 949, 287 P.3d 245 (2012) (behavior during criminal investigation relevant to demonstrate consciousness of guilt); *State v. Otto*, 305 Conn. 51, 73, 43 A.3d 629 (2012) (" 'consciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent' "). Based on these circumstances a rational factfinder could have found Clark guilty beyond a reasonable doubt.

Hence, the evidence was sufficient, and we affirm Clark's convictions.

## SENTENCING ERRORS

Clark brings two attacks on his sentences. At sentencing, the

court imposed concurrent sentences of life imprisonment with a mandatory minimum term of imprisonment of not less than 25 years under Jessica's Law, K.S.A. 21-4643 and also imposed "lifetime postrelease," which was reflected in the journal entry as a term of lifetime postrelease supervision. The journal entry also reflected that Clark would be subject to lifetime electronic monitoring, although there is no mention of electronic monitoring in the transcript of the sentencing hearing. Clark argues that the court erred in imposing lifetime postrelease supervision and lifetime electronic monitoring.

A. *The Sentencing Court Erred in Imposing Lifetime Postrelease Supervision.*

First, with regard to the imposition of lifetime postrelease supervision, the State concedes that this court has previously decided this issue in Clark's favor. " 'An inmate who has received an off-grid indeterminate life sentence can leave prison only if the [Kansas Prisoner Review] Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of [lifetime] postrelease supervision in conjunction with an off-grid indeterminate life sentence.' " *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (quoting *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 [2011]); see *State v. Harsh*, 293 Kan. 585, 590, 265 P.3d 1161 (2011) (parole is separate and distinct from the sentence; if defendant with off-grid indeterminate life sentence ever leaves prison, it will be because parole was granted).

Because the sentencing court erred in imposing lifetime postrelease supervision from the bench, that portion of Clark's sentences is vacated. See *State v. Floyd*, 296 Kan. 685, 690-91, 294 P.3d 318 (2013) (holding remedy when postrelease supervision is announced from the bench is to vacate that portion of the sentence); *State v. Ross*, 295 Kan. 1126, 1134, 289 P.3d 76 (2012) (same); *Summers*, 293 Kan. at 831-32 (same).

B. *The Sentencing Court Erred in Imposing Lifetime Electronic Monitoring.*

Next, Clark correctly points out a second error with regard to his sentences—lifetime electronic monitoring. The State concedes this was error. Indeed, it is well established that although lifetime electronic monitoring is mandated as a condition of parole under K.S.A. 2008 Supp. 22-3717(u), "the sentencing court does not have the authority to impose parole conditions." *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012) (citing *State v. Jolly*, 291 Kan. 842, 848, 249 P.3d 421 [2011]); see *State v. Waggoner*, 297 Kan. 94, 100, 298 P.3d 333 (2013); *State v. Beaman*, 295 Kan. 853, 869, 286 P.3d 876 (2012); see also K.S.A. 2013 Supp. 22-3717(u) ("When the [Kansas prisoner review] board orders the parole of an inmate pursuant to this subsection, the board shall order as a condition of parole that the inmate be electronically monitored for the duration of the inmate's natural life.").

Here, the court did not announce lifetime electronic monitoring from the bench during the sentencing proceeding. Thus, this particular sentencing error lies with the journal entry, not the announced sentences. *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007) ("A journal entry that imposes a sentence at variance with that pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed."); *State v. Lyon*, 207 Kan. 378, 381-82, 485 P.2d 332 (1971) (allowing State's nunc pro tunc order to correct journal entry to conform with sentence).

Consequently, we remand this case to the district court with directions to issue a nunc pro tunc order correcting that portion of the journal entry that included lifetime electronic monitoring. See *Mason*, 294 Kan. at 677. The journal entry should also vacate the postrelease supervision term imposed by the court in the previous journal entry.

Convictions affirmed, sentences vacated in part, and case remanded with directions.