NOT DESIGNATED FOR PUBLICATION

No. 115,036

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

YAMUNA RIZAL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed February 17, 2017. Affirmed.

*Jonathan Laurans* and *Christopher Angles*, of Kansas City, Missouri, for appellant.

*James Crux*, legal intern, *Jacob Gontesky*, assistant district attorney, *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

*Per Curiam*: Yamuna Rizal appeals her conviction for possession with intent to distribute synthetic cannabinoids. Rizal argues that she did not voluntarily consent to a search of her store, and that the district court should have suppressed evidence derived from the search. Additionally, Rizal argues that she was subject to custodial interrogation without proper warnings, and that the district court should have suppressed statements she made to the police during the search. Because Rizal's encounter with the police was voluntary and her consent to search was not coerced, the district court did not err in

1

denying Rizal's motion to suppress. Rizal also challenges the sufficiency of evidence to establish that she knew that the items seized were illegal. But, the district court had sufficient evidence to support its conclusion, so its decision is affirmed.

FACTUAL AND PROCEDURAL HISTORY

In 2012, the Shawnee Police Department received a narcotics tip from the Johnson County Adult Residential Center. The facility reported that synthetic cannabinoids had been found within the facility and that the drugs may have originated from a Phillips 66 store in Shawnee. Two police officers, Detective Shawn Miller and Detective Steve Hahne, went to the Phillips 66. They were wearing jeans and t-shirts with tactical police vests, and they were armed with department-issued firearms and TASERs. Rizal was the only person in the store when the police arrived—she was working behind the counter. Rizal said that her husband owned the store.

Detective Miller advised Rizal that they were investigating a complaint that synthetic cannabinoids were being sold in the store. Detective Miller asked Rizal if she sold "flavored tobacco," but she seemed not to understand. Detective Miller also asked Rizal if she sold "incense" to which Rizal replied that she did not. "Flavored tobacco" and "incense" are street names for synthetic cannabinoids. When Detective Miller asked Rizal if she sold K2 she said she did not sell it because it was illegal.

Detective Miller asked if he and Detective Hahne could look behind the counter and Rizal said yes. Detective Miller walked behind the counter and saw packages consistent with synthetic cannabinoid packages under the countertop. Rizal was able to quote the prices for a couple of the packages. Rizal was unable to tell Detective Miller what the product was for, but she "was quick to say that it wasn't the smoke." At one point Rizal told Detective Miller that she had last sold the product a month ago, but later

2

she said she last sold it a week ago. Rizal indicated that she would sell 5 to 10 packages a day.

The police continued to search the store, and Rizal consented to a search of the back room. The police found invoices in the store that showed that "the store was regularly ordering what [Detective Miller] would consider a substantial amount of these packages every 4 to 5 days . . . ." Rizal allowed the police to make copies of the invoices.

The police encounter with Rizal in the Phillips 66 lasted close to an hour. The encounter was recorded on one of the officer's body cameras. Throughout the encounter, neither detective informed Rizal that she could refuse to consent to a search "[b]ecause it's not legally required." The police also did not inform Rizal of her *Miranda* rights because "[s]he was never in custody." Rizal served customers that came into the store throughout the encounter, and Rizal also placed a phone call (likely to her husband). Rizal was free to move around the store. The police did not arrest Rizal. At the end of the encounter the police confiscated the suspicious packages and sent them to the crime lab.

Crime lab testing revealed that the packages contained illegal synthetic cannabinoids. The State charged Rizal with distribution of naphthoylindole (a synthetic cannabinoid) within 1,000 feet of a school and possession of a controlled substance without a drug tax stamp as those statutes existed at the time of the offense.

Before trial, Rizal filed a motion to suppress. She first argued that any statements she made to police should be excluded because she was subject to custodial interrogation without having been advised of her *Miranda* rights. Rizal also argued that she did not voluntarily consent to a search of her store, and thus the evidence gathered during the search should be suppressed. The district court denied Rizal's motion to suppress.

3

The parties proceeded to trial on stipulated facts. In sum, the factual stipulations were that police officers entered Rizal's store, which was located 827 feet from Shawanoe Elementary School, and found packets containing illegal synthetic cannabinoids. The district court found Rizal guilty on both charges. The district court departed dispositionally from the presumptive prison sentence that accompanied the distribution charge. The court ordered Rizal to serve 60 days in jail before beginning her 36-month probation with an underlying sentence of 49 months in prison.

Rizal appealed.

ANALYSIS

*The district did not err by failing to suppress evidence found during a search of Rizal's store.*

Rizal's first argument is that the district court erred in denying her motion to suppress evidence that the police gathered in their search of Rizal's store. Rizal argues that the district court erred by relying on the wrong legal standard in concluding that she consented to the search and "[a]s such, it will be all but impossible for this Court to conduct appellate review of the District Court's ruling . . . ." Additionally, Rizal argues that she did not voluntarily consent to the search. Rizal also argues that she was illegally detained, and that even if she voluntarily consented to the search, her consent did not purge the taint of the illegal detention.

In reviewing the granting or denial of a motion to suppress evidence, the court determines whether the factual findings underlying the trial court's suppression decision are supported by a substantial competent evidence standard. The ultimate legal conclusions drawn from those factual findings are reviewed under a de novo standard.

4

*State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). When material facts are not in dispute, an appellate court exercises plenary review of a district court's ruling on a motion to suppress evidence. *State v. James*, 301 Kan. 898, 908, 349 P.3d 457 (2015).

"The Fourth Amendment to the United States Constitution protects everyone's right to be secure in his or her person and not subject to unreasonable searches by the government. Without a warrant, a search is unreasonable unless it falls within a recognized exception." *James*, 301 Kan. at 908. Consent is an exception to the warrant requirement. 301 Kan. at 908. To establish valid consent, the State must prove: (1) clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the absence of duress or coercion, express or implied. 301 Kan. at 909. "'[W]hether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" *State v. Thompson*, 284 Kan. 763, 783, 166 P.3d 1015 (2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 [1973]).

*The district court's ruling was properly based on the totality of the circumstances.*

Rizal makes a preliminary argument that the district court did not apply the "rules for determining 'voluntariness of consent' from the facts of a given case" and thus "it will be all but impossible for this Court to conduct appellate review of the District Court's ruling." Rizal argues that it was incorrect for the district court to cite to the factors in *State v. Morton*, 286 Kan. 632, Syl. ¶ 3, 186 P.3d 785 (2008), in considering her motion. Before ruling on the motion to suppress, the district judge described *Morton* as having "eight factors for the Court to consider in determining from a totality of the circumstances whether or not the statement is appropriately admitted as being a voluntary statement by the defendant." The district judge took those eight factors into account as well as testimony at the motion to suppress hearing and the body camera video. In

5

making his ruling, the district judge stated, "I'll find from the totality of the circumstances . . . that the consent was voluntary on Ms. Rizal's part . . . ."

Rizal is correct that the *Morton* factors apply when a court is determining whether a person is subject to a custodial interrogation. See *Morton*, 286 Kan. at 640. However, the fact that the district court cited to them in this situation does not mean that the district court failed to base its ruling regarding the voluntariness of Rizal's consent on the totality of the circumstances. The record shows that the district court judge reviewed the entire encounter between Rizal and the police before making his ruling. Thus, the district court's ruling was properly based on a totality of the circumstances. It is worth noting that Rizal's motion to suppress also made arguments regarding custodial interrogation. It is possible that the district court mixed the analyses of the two issues. However, "[a] district court's reasons for its decision are immaterial if the ruling was correct for any reason." *Dickerson v. Kansas Dept. of Revenue*, 253 Kan. 843, 848, 863 P.2d 364 (1993).

> *Rizal's encounter with the police was a voluntary encounter and not an investigative detention.*

Rizal argues that "what might appear to have started technically as a voluntary encounter was certainly more an investigatory detention, transformed that way almost immediately." She argues that Kansas law requires investigative detentions to be predicated on reasonable articulable suspicion of criminal activity. And, "regardless of consent, the search was not properly predicated upon reasonable suspicion." The issue of whether this situation was a voluntary encounter or investigatory detention is also relevant to Rizal's argument that she did not voluntarily consent to the search, which is discussed later in this section.

"Investigatory stops require reasonable suspicion of criminal activity. [Citations omitted.] By contrast, voluntary encounters are not considered seizures; as such, they do

6

not implicate the Fourth Amendment." *State v. Kermoade*, 33 Kan. App. 2d 573, 579, 105 P.3d 730 (2005). "A court looks to the totality of the circumstances to determine whether a particular encounter constitutes a seizure implicating Fourth Amendment rights." 33 Kan. App. 2d at 580. "The test of whether a seizure has occurred is based on whether a reasonable person would have felt free to decline an officer's request or otherwise terminate the encounter." 33 Kan. App. 2d at 580. Moreover, the reasonable person test presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).

Rizal relies heavily on *Kermoade* to support her argument. In *Kermoade*, three police officers went to Angela Kermoade's house based on a tip from an informant that there was marijuana growing in the house. The informant was not reliable, and a police officer testified that he would not base a search warrant application solely on the informant's word. The officer testified that his intention in going to Kermoade's house was to get her consent to search the house. The police knocked on Kermoade's door and asked if they could come inside. Kermoade said no. The police asked Kermoade to step outside and Kermoade complied, shutting the front door behind her. The police explained that they wanted to search her house based on a tip, but Kermoade adamantly refused. The police said they would apply for a search warrant if she continued to refuse and that, while people would be allowed to leave the house, "those remaining would have to be in the presence of an officer." 33 Kan. App. 2d at 575. Kermoade went inside to talk to her husband. She left the door cracked when she went inside. After several minutes, the police officers began yelling for Kermoade and her husband to come to the door. At this point, the officers said that they were let in but "[t]here was testimony they were already inside the home." 33 Kan. App. 2d at 576. The officers sat in the living room and conversed with Kermoade and her husband for approximately 30 minutes. The police informed the defendants that they could refuse to consent to a search. At the end of the conversation, Kermoade and her husband gave the police consent to search the home. The police found marijuana.

7

Kermoade made a motion to suppress the marijuana evidence, "claiming the consent was not voluntarily given but coerced following the officers' unlawful intrusion into their home." 33 Kan. App. 2d at 576. The district court granted the motion. The district court said that while the encounter began as a voluntary """knock and talk,""" it transformed into a """knock and twist the arm out of the socket""" when the officers asked Kermoade to step out of her home. 33 Kan. App. 2d at 580. At that point, the encounter turned into a seizure. 33 Kan. App. 2d at 580. The district court then considered whether "the subsequent consent to the search was voluntary and whether the consent purged the taint of the illegal detention" and concluded that the search was not voluntary. 33 Kan. App. 2d at 581. The Court of Appeals affirmed the district court because "[t]he officers' persistence totally overcame the defendants' will. The officers said they were there to 'get' the defendants' consent to search." 33 Kan. App. 2d at 581.

There are several factors that distinguish *Kermoade* from the facts in this case. First, Kermoade refused the officers' initial requests to search, but the officers continued to ask. The *Kermoade* court "determined the consensual encounter began its transformation into a seizure when the officers asked Kermoade to step outside her home." 33 Kan. App. 2d at 580. Rizal, unlike Kermoade, never refused the officer's request to search.

Second, when Kermoade went inside her house the officers yelled for her to come to the door. The *Kermoade* court characterized this as an "'order' to return to the front door" that a reasonable person could not disregard. 33 Kan. App. 2d at 580. The officers that questioned Rizal never ordered her to do anything or go anywhere. Their questioning was free of the coercion that transformed the *Kermoade* encounter into a seizure.

The *Kermoade* court also stated that "[t]he testimony that if the request [for consent to search] was denied that an officer would remain with each occupant of the home further shows neither defendant was free to leave." 33 Kan. App. 2d at 580. In

8

contrast, the police did not threaten to stay with Rizal until they could obtain a warrant to search. Rather, they informed her that they would not be arresting her that day.

Rizal argues that her movements were "'restricted and controlled'" like Kermoade's because she was the only person working at the store and it would be impractical for her to leave. However, the pressure she felt to stay in the store was not a result of police coercion, but rather because she did not want to leave the store unattended. The presence or absence of police is immaterial to whether she felt free to leave the store. Rizal's movements were not "restricted and controlled" like Kermoade's—Rizal freely moved around her store and served customers during the encounter. This is analogous to *Bostick*, 501 U.S. 429. In *Bostick*, police boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale. The police asked Terrance Bostick, a passenger on the bus, if they could search his luggage. The Florida Supreme Court held that Bostick was seized because a reasonable person would not feel free to leave the bus. In rejecting this holding, the United States Supreme Court stated:

> "The state court erred, however, in focusing on whether Bostick was 'free to leave' rather than on the principle that those words were intended to capture. When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter.
>
> Here, for example, the mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him. Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct was coercive." 501 U.S. at 435-36.

9

For these reasons, Rizal's reliance on *Kermoade* is misplaced. Rizal also cites the fact that the detectives entered her "store in uniform, badges in full view, armed with guns in full view" to support her argument. This does not transform the encounter into an investigatory detention. The officers never drew their weapons or applied any force to Rizal. Under a totality of the circumstances, Rizal was free to terminate her encounter with the police. Thus, the voluntary encounter was not transformed into an investigatory detention and the police did not need reasonable articulable suspicion to talk to Rizal.

*Rizal voluntarily consented to the police's request to search her store.*

Rizal argues that she did not voluntarily consent to the police search of her store. She cites several factors in support of this argument: (1) English is not Rizal's native language; (2) the detectives never informed Rizal of her rights or told Rizal that she was free to decline consent; (3) the encounter lasted 50-60 minutes; and (4) the police officers' behavior was coercive.

Rizal argues that she could not voluntarily consent because English is not her native language. The district court judge considered this, noting that he "took a look at that through the video in particular." The district court concluded that "[t]he question of the defendant's understanding of the language and her ability to communicate comes into question, in part, from these brief responses that she makes. But she certainly does communicate to the detectives throughout and is cooperative with them." Substantial competent evidence supports the district court's determination. The body camera footage shows that Rizal understood what the officers were asking. While some of her responses were evasive or contradictory, they do not betray a lack of understanding. Thus, this factor does not weigh in favor of finding that Rizal's statement was involuntary.

Police are not required to inform citizens of their constitutional right to refuse consent. This is because it is "unrealistic to require police officers to always inform

10

detainees that they are free to go before a consent to search may be deemed voluntary." *Ohio v. Robinette*, 519 U.S. 33, 39-40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996). However, the courts "must . . . consider whether the individual was informed of his or her rights." *State v. Parker*, 282 Kan. 584, 595-96, 147 P.3d 115 (2006). This factor, alone, is not enough to establish involuntariness of consent.

The length of the encounter also does not show that her consent to the search was involuntary. Rizal compares her situation to Kermoade, in which consent to search was gained after more than 30 minutes of repeated requests and refusals. However, Rizal consented to the officers' search behind the counter within 1 minute of the officers' entry into her store. Rizal consented to a search of the cabinet below the counter, where the officers found the synthetic cannabinoids, about 3 minutes after the officers' entry into the store. And, Rizal consented after the first request to search. The *Kermoade* court was concerned that the police "'wouldn't take no for an answer.'" 33 Kan. App. 2d at 580. The police never indicated to Rizal, as they did to Kermoade, that they would not take no for an answer.

Finally, Rizal argues that "the detectives' mannerisms and show-of-force in their presence weigh heavily in favor of a legal conclusion that the consent they claim to have elicited wasn't freely given." Consent is not voluntary if it is gained by coercion. Determining whether coercion existed is a fact-specific determination, and "no list of factors can be exhaustive or exclusive." *Thompson*, 284 Kan. at 811. Factors suggesting coercion include the following:

> "[T]hreatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the public, or the display of emergency lights." 284 Kan. at 811.

11

Here, the district court found that Rizal was not coerced, stating, "The two officers there did not impose themselves on her. It was a very congenial conversation. The defendant was not physically actually restrained in any way. The officers never drew their weapons, other than they were evident from their general appearance." The body camera footage shows that the district court accurately characterized the encounter, thus the district court's determination that Rizal was not coerced was supported by substantial competent evidence.

The factors Rizal cites do not establish that, in view of the totality of the circumstances, her consent to the search was involuntary. Therefore, the district court's decision on this issue is affirmed.

*The district court did not err by failing to suppress statements that Rizal made to the police.*

Rizal argues that the statements she made to the police should have been suppressed because the police did not advise Rizal of her *Miranda* rights. Rizal argues that police were required to give her *Miranda* warnings because she was subjected to a custodial interrogation. See *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Miranda* warnings are "designed to safeguard the Fifth Amendment privilege against self-incrimination by reducing the risk of a coerced confession." *Morton*, 286 Kan. at 639. "[L]aw enforcement officers are not required to administer *Miranda* warnings to everyone questioned, only to those who are (1) in custody and (2) subject to interrogation." *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012). Neither party disputes that Rizal was being interrogated, so the inquiry is whether Rizal was in custody for the purposes of *Miranda*.

12

"The United States Supreme Court has determined that the question of whether the interrogation is custodial must be determined based on an objective standard of how a reasonable person in the suspect's situation would perceive his or her circumstances." *State v. Jones*, 283 Kan. 186, 193, 151 P.3d 22 (2007), *disapproved on other grounds by State v. Nelson*, 291 Kan. 475, 243 P.3d 343 (2010). "A two-part inquiry is used to determine whether an interrogation is custodial for purposes of *Miranda*. The first prong is: What were the circumstances surrounding the interrogation?" *Morton*, 286 Kan. at 640. Appellate courts review the first prong under a substantial competent evidence standard. 286 Kan. at 640. "The second prong of the inquiry is: Under the totality of those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave?" 286 Kan. at 640. Appellate courts "apply a de novo standard of review to that determination." 286 Kan. at 640.

The Kansas Supreme Court has identified eight nonexclusive factors for courts to consider in determining whether an interrogation is custodial:

"(1) the time and place of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the officers to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation." *State v. Bridges*, 297 Kan. 989, 1008, 306 P.3d 244 (2013).

A review of the eight factors supports the district court's holding that Rizal was not in custody and thus not entitled to *Miranda* warnings.

13

*(1) Time and place of interrogation*

The interrogation took place at Rizal's place of employment. "Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weighs against a conclusion that an interview was custodial." *Warrior*, 294 Kan. at 497. Rizal's store lacked the coercive nature of police stations that *Miranda* warnings are designed to protect against. Thus, this factor weighs in favor of finding that Rizal was not in custody.

*(2) Duration of interrogation*

The police were in Rizal's store for approximately 50-55 minutes. The district court judge thought that the length of the contact "may in the abstract seem a little excessive, but much of that elongated conversation was from the fact of how Ms. Rizal responded to the questions of the detectives." Furthermore, Rizal was not interrogated for the full time period. During the encounter, Rizal served customers, moved around the store, and spoke on the phone. Even if the interview had lasted a full hour, "that would not be such a long period of time that the interview would become custodial, unless there were other indications that [the defendant] wasn't free to leave." *State v. Criqui*, No. 114,940, 2016 WL 7186499, at *5 (Kan. App. 2016) (unpublished decision), *petition for rev. filed* December 27, 2016. Thus, this factor does not weigh in favor of finding that Rizal was in custody.

*(3) Number of law enforcement officers present*

Two officers were present during the encounter. This is not an overwhelming number of officers and does not influence the analysis of whether Rizal was in custody. See *Warrior*, 294 Kan. at 498 ("There were two officers present in the room. We do not see this number as influencing our analysis.").

*(4) Conduct of officers and person interrogated*

The police officers conducted themselves in a noncoercive manner. As the district court explained, "The two officers there did not impose themselves on her. It was a very congenial conversation." The officers asked questions, but did not make commands. They were honest with Rizal and explained why they were in her store. The officers did not threaten Rizal. Rizal conducted herself in the way one would expect of a shopkeeper— throughout the encounter she waited on customers, moved around the store, and made a personal phone call.

*(5) Physical restraint*

"Restraint, as contemplated by *Miranda*, is the interference with a person's freedom which is imposed by law enforcement officers." *Warrior*, 294 Kan. at 498. The police did not physically restrain Rizal. While the officers were armed, they did not draw their weapons or use them in any way that might make Rizal feel that she could not leave. Rizal was moving freely around the store during the questioning. Rizal argues that she was not free to leave because she was the only person working in the store, but "physical incapacity resulting from forces outside the control of law enforcement does not amount to custody." *Warrior*, 294 Kan. at 498. Thus, this factor weighs against finding that Rizal was in custody.

*(6) Whether person questioned is a suspect or witness*

Rizal argues that she was questioned as a suspect, and that this suggests that she was in custody. Detective Miller testified that he did not view Rizal as a suspect. It does seem as though Rizal was a suspect. The police were investigating a complaint that K-2 was being sold at Rizal's store. As a salesperson and part owner of the store, Rizal would presumably be the person that is selling K-2. Because the police treated Rizal as a suspect, this factor gives some support to Rizal's position that she was in custody. However, this factor is not determinative. See *Bridges*, 297 Kan. at 1010 ("But the fact

15

that a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings.").

*(7) How person interrogated arrived at place of interrogation*

There are no facts establishing how Rizal arrived at the gas station. The parties assume she arrived on her own volition. This factor does is not persuasive in either direction.

*(8) Aftermath of interrogation*

During the course of the interrogation, the police told Rizal that they would not be placing her under arrest. The police kept their word and did not arrest Rizal after the encounter. This supports the argument that Rizal was not in custody.

These eight factors "are not to be applied mechanically or treated as if each factor bears equal weight." *Morton*, 286 Kan. at 640. But, they help develop whether the totality of the circumstances support a finding of custody. Here, there is substantial competent evidence to support the district court's factual determinations. These facts support the district court's legal conclusion that Rizal was not in custody. The police did not act in a coercive manner. They did not command Rizal to do anything or restrain her physical movement in any way. Based on a totality of the circumstances, a reasonable person would have felt free to terminate the interview. Accordingly, the district court did not err.

*There was sufficient evidence of Rizal's intent for the district court to find her guilty.*

Rizal's final argument is that there was insufficient evidence of her *mens rea*—or the precise state of mind required for her crime—to support her conviction under K.S.A. 2011 Supp. 21-5705. To support her argument, Rizal cites *McFadden v. United States*, 576 U.S. ___, 135 S. Ct. 2298, 192 L. Ed. 2d 260 (2015). Rizal argues that *McFadden* requires the prosecution to introduce evidence that the defendant actually knew that either

16

(1) "the substance at issue–regardless of what it is–was indeed illegal because it is *listed statutorily* as 'prohibited'"; or (2) "that the substance at issue was indeed *a specific substance known by the defendant*, whether or not the defendant also knew it to be listed as 'prohibited,' (i.e., no mistake of fact by the defendant as to what the substance was)." Rizal acknowledges that Kansas has not yet adopted *McFadden*'s holding.

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

Rizal, relying on *McFadden*, argues that the district court was required to make findings that she knew the synthetic cannabinoids she was selling were illegal. In *McFadden*, the defendant was convicted of distributing controlled substance analogues after law enforcement officers made five controlled buys of bath salts from the defendant. The defendant argued that he did not know that the bath salts were regulated as controlled substances under the Controlled Substance Analogue Enforcement Act of 1986. The United States Supreme Court reversed the defendant's conviction, holding that when a controlled substance is an analogue, 21 U.S.C. § 841(a)(1) requires the government to establish that the defendant knew he was dealing with a substance regulated under the Controlled Substances Act or Analogue Act. 135 S. Ct. at 2302.

In reaching this holding, the United States Supreme Court began with the language of the Controlled Substances Act, specifically 21 U.S.C. § 841(a)(1). This statute makes it "'unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.'" 135 S. Ct. at 2303. The Court held that "[u]nder the most natural reading of this provision, the word 'knowingly' applies not just to the statute's verbs but also to the

object of those verbs—'*a* controlled substance.'" 135 S. Ct. at 2304. The government can establish the required knowledge in one of two ways: (1) proving that the defendant knew he was distributing a substance listed on the schedules, even if he did not know which substance it was; or (2) showing that the defendant knew the identity of the substance he was distributing, even if he did not know it was listed on the schedules. 135 S. Ct. at 2305.

Rizal argues that this court should embrace the *McFadden* analysis because "both K.S.A. 21-5705 and 21 U.S.C. 841 . . . have identical 'knowingly' language as the *mens rea* requirement." This is not the case. Kansas' statute is written differently than the federal Controlled Substances Act. K.S.A. 2011 Supp. 21-5705(a) states: "It shall be unlawful for any person to cultivate, distribute or possess with the intent to distribute any of the following controlled substances or controlled substance analogs thereof . . . ." The Kansas statute does not contain "knowing" language because it is silent as to *mens rea*. However, another Kansas statute provides that crimes, other than crimes that the legislature explicitly classifies as strict liability crimes, require a mental state. K.S.A. 2011 Supp. 21-5202(d). And, "[a] culpable mental state may be established by proof that the *conduct* of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'" (Emphasis added.) K.S.A. 2011 Supp. 21-5202(a).

While the *McFadden* Court held that the mental state applied to both the verbs (manufacture, distribute, dispense, possess) and the object of the verbs (a controlled substance) in the statute, Kansas' statute only imposes the mental state on *conduct*. Unlike in *McFadden*, nothing in the Kansas statutes suggests that Rizal needed knowledge of the specific drug she was distributing. The definition of "possession" in the K.S.A. supports this. "'Possession' means having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2011 Supp. 21-5701(q). In other words, the "knowledge" required to possess a thing is knowledge that a person is

18

exercising control over the thing. The statute does not suggest that a person must have knowledge of what the item is.

The defendant in *State v. Marsh*, 9 Kan. App. 2d 608, 684 P.2d 459 (1984), made an argument similar to Rizal's. In *Marsh*, the defendant sold a baggie containing black capsules which "were very similar in appearance to black capsules known as 'black beauties,' a prescription drug containing a slow-releasing kind of amphetamine preparation." 9 Kan. App. 2d at 609. The capsules did not in fact contain any controlled substances. The defendant was convicted of violating K.S.A. 1983 Supp. 65-4155(a)(2), which stated: "'No person shall knowingly deliver or cause to be delivered in this state any substance which is not a controlled substance' . . . 'under circumstances which would give a reasonable person reason to believe that the substance is a controlled substance.'" 9 Kan. App. 2d at 609. The defendant argued that "the evidence was that only an expert could tell what the capsules contained, and that in order to convict under K.S.A. 1983 Supp. 65-4155, the State must prove that the defendant *knew* that the item was not a controlled substance when she delivered it." 9 Kan. App. 2d at 610. The Court of Appeals held that the State was not required to prove that the defendant had the specific intent to deliver a noncontrolled substance. 9 Kan. App. 2d at 611. Thus, "[t]he fact that the defendant did not know the substance was noncontrolled, or may have in good faith believed the substance to be a controlled substance, is not a defense." 9 Kan. App. 2d at 611-12; see also *State v. Gillon*, 25 Kan. App. 2d 809, 811, 974 P.2d 1115 (1999) (defendant was not entitled to mistake-of-fact instruction in prosecution for possession of sawed-off shotgun because State was required only to prove possession of outlawed weapon not knowledge of specific length of barrel as compared to legal minimum).

But even if we were to adopt the *McFadden* analysis, there is sufficient evidence, when viewed in the light most favorable to the prosecution, to support the district court's conclusion. There is no evidence that Rizal knew the identity of the substance she was distributing—even the police did not know that the packages they confiscated contained

19

naphthoylindole until the crime lab tested the packages. See *McFadden*, 135 S. Ct. at 2304. However, there is circumstantial evidence that the Rizal knew she was distributing a substance listed on the schedules, even if she did not know which substance it was. See 135 S. Ct. at 2300-01. The *McFadden* Court recognized that *mens rea* could be proven through circumstantial evidence, which "could include . . . a defendant's concealment of his [or her] activities" and "evasive behavior with respect to law enforcement." 135 S. Ct. at 2304 n.1.

Here, several factors support the conclusion that Rizal knew she was selling an illegal drug. First, the drugs were not displayed openly on the countertop. Rather, they were stashed below the countertop where no one could see them. This is circumstantial evidence that Rizal knew the packages contained illicit substances—the district court could reasonably infer that Rizal was concealing her activities because she knew they were illegal. Shopkeepers have a clear interest in displaying items for sale, not concealing them from their customers. Second, when the police officers asked Rizal if she sold K-2, flavored tobacco, or incense, Rizal said she did not sell those products because they are illegal. But, when the police asked Rizal what customers would ask for if they wanted the packages below the counter, Rizal said the customers would ask for "'incense.'" Rizal's acknowledgement that incense is illegal and that customers seeking the packets below the counter would ask for incense supports the conclusion that Rizal knew the packets contained illegal substances. Third, Rizal said that she was not currently selling the packages because she "heard that these things [are] illegal." But, Rizal admitted that she had last sold the packages a month previously. Later, Rizal said that she had last sold the packages a week ago "and then indicate[d] they have been continuing to sell the product when she [was] confronted with paperwork indicating the store ha[d] ordered hundreds of packets of the product from distributors over the past few weeks." Eventually, "Rizal admitted she was selling 5 to 10 packages of synthetic cannabinoid per day." Rizal's statement that she was not selling the packages because they were illegal, and later her

admissions that she was in fact still selling the packages, supports the conclusion that Rizal knew the packages contained illegal substances.

Construing the evidence in the light most favorable to the State, there was sufficient direct and circumstantial evidence that Rizal knew the packages she sold contained an illegal substance. Thus, her conviction is affirmed.

Affirmed.